# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 11-2091

_____

Norman Jay Carpenter,                    *
                                         *
                Appellant,               *
                                         *   Appeal from the United States
        v.                               *   District Court for the
                                         *   Western District of Arkansas.
Deputy Harold D. Gage; Deputy            *
Kenneth D. Paul; Benton County,          *
Arkansas; Sheriff Keith Ferguson,        *
Benton County,                           *
                                         *
                Appellees.               *

_____

Submitted: November 16, 2011
    Filed: July 27, 2012

_____

Before SMITH, COLLOTON, and GRUENDER, Circuit Judges.

_____

COLLOTON, Circuit Judge.

Norman Jay Carpenter brought a civil rights action under 42 U.S.C. § 1983 against two deputy sheriffs in Benton County, Arkansas, alleging that they unlawfully entered his home, detained him, employed excessive force against him, and denied him emergency medical care. Carpenter also asserts a failure-to-train claim against

Benton County and its sheriff. The district court[1] granted summary judgment for the defendants. The court ruled that Carpenter had not presented sufficient evidence to prove a constitutional violation, and that the defendants were thus entitled to qualified immunity. Carpenter appeals, and we affirm.

## I.

On April 4, 2008, Carpenter was sleeping at his home in Benton County with Connie Gunem, his girlfriend. When Gunem awoke, she saw that Carpenter "looked horrible." Carpenter was slurring his speech to the point of incomprehensibility. His face was drawn, saliva was dripping from his mouth, and he kept falling over. After Gunem said she would call an ambulance, Carpenter argued with her, so Gunem went outside to call 911. When the first responders arrived, one paramedic started to enter the house behind Gunem. At that point, Carpenter met them in a front hallway, denied that he needed medical aid, and ordered them to leave his house, saying "I got a baseball bat that says you will get out of here." Gunem and the first responder backed out through the door.

Harold Gage, a Benton County deputy sheriff, arrived shortly thereafter. Gage responded to a call from a dispatcher that first responders had been threatened with a baseball bat. Gage spoke with Gunem, who said she believed that Carpenter may have suffered a stroke. Gunem informed Gage that Carpenter had a rifle in the house, but that she did not know where he kept it. The first responders told Gage that Carpenter had chased them out of the house with a baseball bat. Gage pulled his car to the front of the house, walked up to the porch, and knocked on the door.

---

[1]The Honorable Jimm Larry Hendren, United States District Judge for the Western District of Arkansas.

Meanwhile, Kenneth Paul, another Benton County deputy sheriff, arrived in response to the same information that Gage had received. Paul learned that Carpenter might have a rifle in his house, and joined Gage on the porch. Carpenter eventually answered the door, and Gage identified himself. Paul then asked Carpenter what was the problem. Carpenter responded by pointing to Paul's badge and saying, "that's the f---ing problem right there." Carpenter stepped back inside the house, and the two deputies followed him. Both deputies testified that they entered because they feared Carpenter could be retrieving a weapon.

Once inside, Gage ordered Carpenter to stop moving about and threatened to deploy a taser gun if Carpenter refused to comply. Gage and Paul claim that Carpenter took a swing at them; Carpenter denies ever raising his hand or swinging at the deputies. In either case, the deputies took Carpenter to the ground and told him to give them his hands so he could be handcuffed. All parties agree that Carpenter neither remained still nor presented his hands to the deputies. According to Paul, Carpenter resisted and would not offer his hands. Carpenter explains that he tried to use the couch for support because he could not breathe. Paul then deployed his taser against Carpenter; the taser strike caused Carpenter to begin to buckle. Paul deployed the taser again, and the deputies were able to restrain Carpenter.

Following the scuffle, a first responder entered the house and looked over Carpenter. The deputies then transported Carpenter to jail, where he was processed, cited for third degree assault, and released.

Gunem told Carpenter's children what had happened. The children drove down from Michigan and took Carpenter to the hospital. An emergency room doctor determined that Carpenter had suffered a stroke, and admitted him to the hospital. Carpenter alleges that the stroke caused permanent damage to his vision and hearing, which in turn has limited his employment and undermined interpersonal relationships.

-3-

Carpenter brought claims under 42 U.S.C. § 1983 against Deputies Gage and Paul, Sheriff Keith Ferguson, and Benton County itself. Five claims are the subject of this appeal: (1) that Gage and Paul unlawfully entered Carpenter's home; (2) that the deputies lacked probable cause to detain or arrest Carpenter; (3) that the deputies' physical contact with Carpenter and use of a taser constituted an excessive use of force; (4) that the deputies' failure to obtain treatment for Carpenter's stroke unlawfully denied him emergency medical care; and (5) that Sheriff Ferguson and the county failed properly to train Gage and Paul how to recognize and treat a person exhibiting symptoms of a stroke. The district court granted summary judgment for the defendants. The court cited qualified immunity, but actually concluded that Carpenter failed to establish that either Gage or Paul deprived him of a constitutional right, and that the absence of an underlying constitutional violation defeated Carpenter's failure-to-train claims.

## II.

We review *de novo* the district court's order granting summary judgment and view the evidence in the light most favorable to Carpenter, drawing all reasonable inferences in his favor. *Schoelch v. Mitchell*, 625 F.3d 1041, 1045 (8th Cir. 2010). In § 1983 claims, qualified immunity shields government officials from liability and the burdens of litigation unless their conduct violated a clearly established constitutional or statutory right of which a reasonable official would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To overcome the deputies' assertion of qualified immunity, Carpenter must produce sufficient evidence to create a genuine issue of fact as to whether they violated a clearly established right.

## A.

Carpenter first argues that the deputies entered his house in violation of the Fourth Amendment. Absent consent, an officer's entry into a home generally requires

-4-

a warrant. *See Payton v. New York*, 445 U.S. 573, 589-90 (1980). An "exigent circumstances" exception to the warrant requirement, however, permits a warrantless entry when the needs of law enforcement are so compelling that a warrantless search is objectively reasonable. *Mincey v. Arizona*, 437 U.S. 385, 393-94 (1978). Such exigencies include the need to render emergency aid to an injured occupant, hot pursuit of a fleeing suspect, and the need to prevent the destruction of evidence. *Kentucky v. King*, 131 S. Ct. 1849, 1856 (2011). A warrantless entry is lawful if officers reasonably believed that exigent circumstances existed. *Anderson v. Creighton*, 483 U.S. 635, 641 (1987).

A reasonable deputy sheriff could have believed that exigent circumstances justified entering Carpenter's home without a warrant. Deputies Gage and Paul both received reports that Carpenter had threatened first responders with a baseball bat. Although Carpenter denies wielding a bat while ordering the first responders out of his house, the relevant question is whether the deputies reasonably believed that he had used a baseball bat. *See Radloff v. City of Oelwein, Iowa*, 380 F.3d 344, 348 (8th Cir. 2004). Here, the deputies were advised by a reliable source that Carpenter had done so. The deputies also were advised by Carpenter's companion that Carpenter kept a rifle in the home. In light of these facts and Carpenter's belligerence toward the first responders and the deputies, it was reasonable for Gage and Paul to believe that Carpenter may have withdrawn abruptly into his home to retrieve a gun. As neither deputy knew where Carpenter's rifle was located, it was reasonable for them to fear that they lacked time to make a safe retreat. A reasonable officer therefore could have concluded that allowing Carpenter to go unaccompanied back into his home posed a threat to the lives of the law enforcement officers and first responders outside the house. *See United States v. Ball*, 90 F.3d 260, 263 (8th Cir. 1996). For these reasons, the district court correctly dismissed Carpenter's claim alleging an unreasonable search under the Fourth Amendment.

B.

Carpenter also asserts that Gage and Paul lacked probable cause to arrest him, and that the seizure violated the Fourth Amendment. Carpenter argues that there is a genuine issue for trial because he disputes the deputies' account that he swung at them.

Regardless of whether Carpenter assaulted the deputies, there was probable cause to arrest Carpenter based on his conduct toward the first responders. Both Gage and Paul reported to the scene based on information that Carpenter had threatened first responders with a baseball bat. Although neither deputy witnessed this conduct, officials may rely on hearsay statements to determine that probable cause exists. *See Illinois v. Gates*, 462 U.S. 213, 241-42 (1983). The report from the dispatcher provided reasonably trustworthy information that Carpenter had assaulted the first responders, so the deputies had probable cause to arrest him. That the deputies' subjective reason for arresting Carpenter may have been different does not invalidate the arrest. *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004).

C.

Carpenter next claims that the deputies violated the proscription on unreasonable seizures by employing excessive force against him. In evaluating whether a particular use of force was excessive, we consider whether it was objectively reasonable under the circumstances. *Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009). We also rely on the perspective of a reasonable officer present at the scene rather than the "20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

When the deputies attempted to arrest Carpenter, he resisted. Deputy Paul testified as follows:

[W]e couldn't get to his arms. The entire time, Mr. Carpenter had his arms underneath him, just huddled up under his chest laying on top of them. We screamed several times, give us your hands, give us your hands, give us your hands, stop resisting. Deputy Gage couldn't get his hands out from underneath him, it was a struggle. Officer Johnson couldn't get his right hand, based off the location he was at. Mr. Carpenter wouldn't give them to us. So during that time, I removed the cartridge from my tazer, and I said, if you do not give us your hands, I will drive stun you in the back. And he didn't do it—did not cooperate, did not comply. I initiated the tazer and drive stunned him on his back for a five-second cycle.

Paul testified that after the taser strike, Carpenter continued to resist. The deputies yelled at Carpenter to stop resisting, but he was "physically fighting" and "bucking," trying to throw off Deputy Gage. Deputy Paul then stunned Carpenter with the taser a second time in the lower back. At that point, Carpenter complied by putting his arms to his side, and an officer applied handcuffs.

The reasonableness of a use of force depends on the particular facts and circumstances, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Law enforcement officers may use physical force to subdue an arrestee when he fails to comply with orders to lie still during handcuffing. *See Mann v. Yarnell*, 497 F.3d 822, 826 (8th Cir. 2007).

It is undisputed that Carpenter refused to offer his hands when ordered to do so, and Carpenter himself testified that he reached for the couch in an effort to lift himself from the floor. Carpenter does not dispute that he was directed to give his hands to the deputies, that he was warned about use of the taser, or that he refused to comply, but he characterizes his struggles merely as an effort to breathe. Even if Carpenter's motive was innocent, the deputies on the scene reasonably could have

-7-

interpreted Carpenter's actions as resistance and responded with an amount of force that was reasonable to effect the arrest. *See McKenney v. Harrison*, 635 F.3d 354, 360 (8th Cir. 2011). Gage and Paul are therefore entitled to qualified immunity against Carpenter's excessive force claim.

D.

Carpenter also argues that the deputies exhibited deliberate indifference to his medical needs in violation of his constitutional rights. Because the alleged violation occurred after Carpenter was arrested, our cases suggest that it is properly analyzed under the Due Process Clause of the Fourteenth Amendment. *McRaven v. Sanders*, 577 F.3d 974, 979 (8th Cir. 2009); *Spencer v. Knapheide Truck Equipment Co.*, 183 F.3d 902, 905 & n.3 (8th Cir. 1999); *cf. Graham*, 490 U.S. at 395 n.10 (noting an unresolved question whether the Fourth Amendment applies to an excessive force claim after an arrest ends and pretrial detention begins). Carpenter cites authorities applying due process analysis, and he does not invoke the Fourth Amendment, so we consider his argument on that basis. *But cf. Ortiz v. City of Chi.*, 656 F.3d 523, 530 (7th Cir. 2011); *Barrie v. Grand County, Utah*, 119 F.3d 862, 870-71 (10th Cir. 1997) (Briscoe, J., dissenting).

This court has said that the due process analysis applicable in this situation parallels that under the Eighth Amendment, because pretrial detainees are entitled to the same protection as imprisoned convicts. *Davis v. Or. Cnty., Mo.*, 607 F.3d 543, 548 (8th Cir. 2010). And we have said that any distinction between a "pretrial detainee" and an "arrestee" does not affect the analysis. *Spencer*, 183 F.3d at 905 n.3. To establish a claim based on deliberate indifference, therefore, Carpenter must demonstrate that he suffered an objectively serious medical need, and that the deputies had actual knowledge of those needs but deliberately disregarded them. *See Williams v. Kelso*, 201 F.3d 1060, 1064 (8th Cir. 2000). A showing of negligence is not sufficient to meet this burden. *Farmer v. Brennan*, 511 U.S. 825, 835 (1994).

Gage acknowledges that when he arrived at the residence, Connie Gunem said she thought Carpenter was having a stroke. Carpenter asserts that Gage, having been so advised, was deliberately indifferent to his serious medical need, and that Deputy Paul also was deliberately indifferent.

Before the deputies could consider responding to Carpenter's medical needs, they had to subdue him and secure the premises. Once this was accomplished, and Carpenter was arrested, first responders examined him briefly. There are conflicting accounts of exactly what happened, but the upshot was that the paramedics did not administer emergency treatment for a stroke, and the deputies transported Carpenter to jail rather than to a hospital.

Paul testified that one of the first responders told Carpenter that they wanted to take him to the hospital for examination, but that Carpenter refused to go. The responders wanted Carpenter to sign a form stating that he refused transportation for medical treatment, but Paul did not want to remove Carpenter's handcuffs. So, according to Paul, he and the first responders asked Carpenter orally whether he refused medical treatment. When Carpenter reaffirmed that he refused treatment, Paul noted the refusal on a form, and the first responders left the residence.

Carpenter denies that he refused medical treatment, but he also denies that the paramedics suggested that he should be transported to the hospital. In Carpenter's version, the deputies asked Carpenter after the arrest whether a paramedic could examine him. A paramedic then looked at Carpenter and asked a colleague what should be done with Carpenter. One of the deputies declared that he was "taking him in for an assault." According to Carpenter, the paramedic did not object and say that Carpenter needed to go to the hospital or tell Carpenter "that there was any problem."

Although the two narratives differ, neither scenario supports a claim of deliberate indifference by the deputies. In Paul's version, the paramedics suggested

transportation to a hospital, but then acquiesced in Carpenter's refusal of medical treatment. They never urged the deputies to bring Carpenter to a hospital for medical treatment over his objections. In Carpenter's scenario, the paramedics never even recommended hospitalization. To prove deliberate indifference, Carpenter must show that the deputies had actual knowledge that failing to provide Carpenter immediate medical treatment posed a substantial risk of serious harm. *See Farmer*, 511 U.S. at 842. Where the medical professionals either acquiesced in Carpenter's refusal of medical treatment, or, under Carpenter's own version, never even suggested that treatment was warranted, there is insufficient evidence that a need for medical treatment was so obvious that the sheriff's deputies exhibited deliberate indifference by taking Carpenter to jail. *See Christian v. Wagner*, 623 F.3d 608, 614 (8th Cir. 2010).

E.

In his final claim, Carpenter contends that Sheriff Ferguson and Benton County are liable under § 1983 for failing to train deputy sheriffs adequately about how to recognize and respond to symptoms of strokes. Without a showing that the deputies violated the Constitution, however, there can be no liability for failure to train. *City of L.A. v. Heller*, 475 U.S. 796, 799 (1986) (per curiam). The district court thus correctly dismissed the claim against the sheriff and the county.

\*     \*     \*

The judgment of the district court is affirmed.

SMITH, Circuit Judge, concurring in part and dissenting in part.

I concur in the court's opinion except the portion that holds, as a matter of law, that the officers did not use excessive force to arrest Carpenter. *Supra* Part II.C. Five

-10-

officers entered Carpenter's home after being advised that Carpenter may have had a stroke. Carpenter was agitated and moving back and forth in the room. At some point, Gage raised his taser and instructed Carpenter to stop walking or Gage would shoot; Carpenter did not comply. One of the officers grabbed Carpenter and took him to the ground.

According to Officer Paul, Carpenter landed face down in a corner between a wall and a couch. Officer James Johnson was on his right side, next to the couch, and "Deputy Gage was . . . by his left arm." "Carpenter had his arms underneath him." Carpenter testified that, when he was thrown to the ground, he couldn't breathe, "so [he] put [his right] arm up on the couch and [was told] to get [his] arm off there. [He] told them [he couldn't] breathe," but "they just kept ta[s]ing [him] in the back." When asked about the tasing, Carpenter responded:

> I was ta[s]ed several times. I can't tell you how many times. They just kept telling me to get my arm down and they just kept ta[s]ing me. I couldn't breathe when I took my arm down. I couldn't breathe and I kept telling them I couldn't breathe and they didn't care.

Counsel asked Carpenter, "Did you put your hands behind your back to be handcuffed when they commanded you to do so?" He replied:

> I think I was on my belly, so I don't know how my hands got back there. I had one hand kind of under me, and one up on the couch, so I don't see how I could have put my hands back there. They were sitting on me, so how could you? I know with them sitting on me with this arm, I know my left arm was underneath me, how could I put it behind me?

"Viewing the record and drawing all reasonable inferences in the light most favorable to [Carpenter], while simultaneously viewing the facts from the perspective

-11-

of a reasonable officer on the scene, we cannot say [the officers'] use of force was objectively reasonable as a matter of law." *Montoya v. City of Flandreau*, 669 F.3d 867, 871 (8th Cir. 2012) (quotation, citation, and alteration omitted). The officers threw Carpenter to the floor face down with his arms under him and sat on top of him. He told the officers repeatedly that he could not breathe and attempted to use his right arm to elevate himself enough to catch his breath. Once Carpenter *told* the officers that he could not breathe, reasonable officers sitting on top of him would not conclude that his attempts to elevate himself constituted resisting arrest.

Moreover, it defies reason that five police officers in control of a single subject would need to tase him repeatedly in order to handcuff him. The majority cites *Mann* for the proposition that "officers may use physical force to subdue an arrestee [who] fails to comply with orders to lie still during handcuffing," *supra* Part II.C (citing *Mann*, 497 F.3d at 826), but that case is distinguishable. *Mann* involved the arrest of a suspect high on methamphetamine who officers forced out of his house with tear gas. Once he was outside, officers "ordered [the defendant] to come under a fence, get down on his stomach, and put his hands behind his back." *Mann*, 497 F.3d at 824. "After [the defendant] disregarded the repeated instructions to get on his stomach" by continuing to twist onto his side, one of the officers ordered his canine to bite and hold the defendant's leg for 15 seconds so they could handcuff him. The defendant "knocked the handcuffs out of [the officer's] hands, and grabbed the barrel of [the officer's] gun." *Id.* He then "rose . . . and . . . continued to resist their attempts to handcuff him." *Id.* One officer struck the defendant five times while two other officers handcuffed him. *Id.* In that case, the defendant offered no evidence to support his version of the facts, and video taken of the arrest did not contradict the officers' factual assertions.

Viewing the facts in the light most favorable to Carpenter and crediting his testimony, officers were on top of him and were holding him face down prior to tasing him. Carpenter was moving, but he repeatedly told the officers he could not

-12-

breathe. Given this evidence, a genuine issue of material fact remains as to whether a reasonable officer would believe that Carpenter was resisting arrest when the officers tased him and, thus, whether the officers used excessive force. *See Brown v. City of Golden Valley*, 574 F.3d 491, 496–98 (8th Cir. 2009) (court not convinced that officer's use of taser on passenger in vehicle stopped after police chase was objectively reasonable; although passenger refused a direct order to get off of the phone, she posed a minimal security threat and was not resisting arrest or attempting to flee, officer was not faced with split-second decision, and circumstances did not constitute tense, uncertain, and rapidly evolving situation).

This does not end our analysis. "Our second inquiry in considering the denial of qualified immunity is whether the right violated was clearly established." *Brown*, 574 F.3d at 499.

> The [t]aser is a relatively new implement of force, and case law related to the [t]aser is developing. Several of our sister circuits have considered whether the deployment of a [t]aser during an arrest constitutes excessive force in violation of the Fourth Amendment. *See, e.g.*, *Parker v. Gerrish*, 547 F.3d 1, 8–11 (1st Cir. 2008) (upholding jury verdict that officer used excessive force in [t]asering an arrestee who had insulted the officers but also had complied with their requests and did not resist arrest); *Zivojinovich v. Barner*, 525 F.3d 1059, 1071–73 (11th Cir. 2008) (per curiam) (use of a [t]aser to subdue a suspect who had repeatedly ignored police instructions and continued to act belligerently found to be reasonably proportionate to the need for force); *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1282–87 (10th Cir. 2007) (use of a [t]aser and related force against a nonviolent misdemeanant who did not flee or actively resist arrest found to be excessive) . . . .

*Id.* at 498 n.5. We recently held that "an officer's use of a taser on a nonviolent, nonfleeing misdemeanant was an excessive use of force" in violation of clearly established law. *Shekleton v. Eichenberger*, No. 11-2108, slip op. at 8 (8th Cir. May

-13-

3, 2012). We also found it clearly established "[t]hat the level of force used must be justified in light of 'the severity of the crime at issue,' the suspect's flight risk, and the immediacy of the risk posed by the suspect to the safety of officers and others." *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

Viewing the facts in the light most favorable to Carpenter, no reasonable officer would believe that Carpenter was a flight risk—he was on the floor with five officers nearby or on top of him. And no reasonable officer would believe that he posed a safety risk—he was pinned to the floor with such force that he could not even catch his breath. The majority's opinion points out that "Carpenter refused to offer his hands" in spite of repeated orders to do so. *Supra* Part II.C. But Carpenter in his deposition indicated that he was unable to offer his hands because "[the officers] were sitting on [him]." *Contra. Brown v. Cwynar*, No. 11-1948, 2012 WL 2045764, at *2 (3rd Cir. Jun. 7, 2012) (finding that, even if a plaintiff's Fourth Amendment rights were violated, the officer was entitled to qualified immunity because the plaintiff "resist[ed] arrest" by lying on top of both of his hands and failing to heed multiple warnings that "if he did not comply, he would be tased"); *Hoyt v. Cooks*, 672 F.3d 972, 975 (11th Cir. 2012) (holding that an arrestee who was "lying on the ground," "continued to resist[,] and would not allow both arms to be put behind his back" did not have his constitutional rights violated by officers who tased him repeatedly before handcuffing him).

Because genuine issues of material fact remain, summary judgment is inappropriate. I therefore respectfully dissent.

_____