# United States Court of Appeals
## For the Eighth Circuit

_____

No. 17-1971

_____

Terry Cravener

*Plaintiff - Appellee*

v.

Mike Shuster, in his individual and official capacity; Chris Calvin, in his individual and official capacity; Kieth Maggard, in his individual and official capacity

*Defendants - Appellants*

Jasper County, MO; John Does I-IV, in their individual and official capacity

*Defendant*s

_____

Appeal from United States District Court
for the Western District of Missouri - Joplin

_____

Submitted: February 16, 2018
Filed: March 27, 2018

_____

Before LOKEN, BENTON, and ERICKSON, Circuit Judges.

_____

BENTON, Circuit Judge.

Terry Cravener sued Jasper County deputies Mike Shuster, Chris Calvin, and Kieth Maggard under 42 U.S.C. § 1983, alleging excessive force. The district court denied the deputies' motion for summary judgment based on qualified immunity. The deputies appeal. This court reverses and remands.

I.

Cravener has paranoid schizophrenia. In May 2013, his father called Jasper County Emergency Services. He requested help getting Cravener a medical evaluation for erratic behavior and medication issues. He said Cravener was "talking to the walls" and "not in the right state of mind." He reported Cravener had not been violent that day, but "could possibly become violent." Emergency Services dispatched deputies and EMS to the father's house.

Deputy Shuster arrived first. The father said he wanted Cravener to get "a 48-hour observation." Once inside the house, Deputy Shuster heard Cravener repeating "I love Satan." Deputy Maggard arrived next. With Deputy Shuster, he found Cravener in a bedroom. Entering the room, they told Cravener he was not in trouble and asked him to sit on the mattress, on the floor. Deputy Calvin then arrived, joining them in the bedroom. When asked, Cravener said he had not taken his schizophrenia medicine in two days. Deputy Shuster explained that his parents were worried about his behavior. Cravener responded with comments about chemical burns on his skin and "two planets that collided into the earth, causing the earth to blow up." Deputy Shuster told him that based on his behavior, they were going to take him to the hospital. Cravener responded that he did not want to go; he began making hand gestures like he was shooting himself in the head. The deputies asked him to roll onto his stomach so they could restrain him. He refused, saying he did not want to go to the hospital. Several times, he laid down, holding his arms and legs in a defensive posture, and then sat back up.

After asking him about 20 times to roll to his stomach, Deputy Shuster took Cravener's left wrist and walked around him trying to get him to lie on his stomach. Cravener pulled his arms away, and Deputy Shuster placed him in a modified bent arm lock. Cravener continued to resist. Deputy Calvin advised Cravener he would tase him if he continued resisting.

Deputy Shuster tried to guide Cravener to his stomach. Cravener suddenly leaned backward. His left arm broke. Deputy Shuster immediately released his hold, but continued to guide Cravener to the floor. Cravener continued resisting and yelling "just shoot me." According to Deputy Maggard, Cravener was unfazed by his broken arm and continued resisting.

Despite repeated commands to show his hands, Cravener kept both arms under him. Deputy Shuster unsuccessfully used nunchucks on his right elbow to get him to release. Deputy Calvin again warned him to stop resisting and release his arms, or be tased. Cravener refused. Deputy Calvin employed a five-second taser cycle (in drive-stun mode[1]) to Cravener's back. When the cycle ended, Cravener resumed cursing and resisting. Four more times, Deputy Calvin warned Cravener to stop resisting or be tased. Each time he refused, resulting in another drive-stun taser cycle on his back. Deputy Maggard observed that the taser did not appear to affect Cravener, and he "kept fighting like nothing." Eventually, using nunchucks, Deputies

---

[1]In drive-stun mode (used here), the officer "applies the taser so as to make direct contact with the subject's body." *De Boise v. Taser Int'l, Inc.*, 760 F.3d 892, 895 n.5 (8th Cir. 2014). When used in drive-stun mode, the taser "causes discomfort" but "does not incapacitate the subject." *Id.* In dart mode (not used here), "[t]asers fire metal probes into the skin, penetrating up to half an inch" and "deliver[ing] a 50,000 volt shock that lasts up to five seconds and causes electrical muscular disruption." *McKenney v. Harrison*, 635 F.3d 354, 362 (8th Cir. 2011) (Murphy, J., concurring) (internal citations and quotation marks omitted).

Shuster and Maggard were able to restrain his right hand and apply a belly chain and leg shackles.

Once secured, the deputies called EMS (waiting outside the door) to inspect his broken arm. Cravener was still resisting. EMS gave him a sedative. Once that took effect, they placed him on a body board and took him to the hospital. Cravener remembers nothing from the day of the incident.

Cravener sued the deputies for excessive force and Jasper County for failure to train and unconstitutional policies, customs, and practices. The district court granted summary judgment to Jasper County. In two short paragraphs with little explanation, however, the district court found genuine issues of material fact precluding summary judgment for the deputies on the basis of qualified immunity. The district court failed to identify any disputed facts. Because there are no material disputed facts, this court now grants qualified immunity.

## II.

Government officials, like the deputies here, are entitled to qualified immunity "unless the official's conduct violated a clearly established constitutional or statutory right of which a reasonable official would have known." **Chambers v. Pennycook**, 641 F.3d 898, 904 (8th Cir. 2011), *citing **Harlow v. Fitzgerald***, 457 U.S. 800, 818 (1982). This court reviews a denial of summary judgment de novo, viewing the record most favorably to the non-moving party. **Revels v. Vincenz**, 382 F.3d 870, 874 (8th Cir. 2004). This court also reviews "the finding of qualified immunity de novo." **Peterson v. Kopp**, 754 F.3d 594, 598 (8th Cir. 2014).

Determining qualified immunity, this court considers a "two-step inquiry: (1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the

-4-

defendant's alleged misconduct." ***Brown v. City of Golden Valley***, 574 F.3d 491, 496 (8th Cir. 2009), *citing **Saucier v. Katz***, 533 U.S. 194, 201 (2001). To deny qualified immunity, the answer to both questions must be yes. *See **Pearson v. Callahan***, 555 U.S. 223, 232 (2009).

A.

To show excessive force, a plaintiff "must demonstrate a seizure occurred and the seizure was unreasonable." ***McCoy v. City of Monticello***, 342 F.3d 842, 846 (8th Cir. 2003). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." ***Graham v. Connor***, 490 U.S. 386, 396 (1989). "Factors relevant to assessing the objective reasonableness of force used by officers include:

> 'the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.'"

***Ryan v. Armstrong***, 850 F.3d 419, 427 (8th Cir. 2017), *quoting **Graham***, 490 U.S. at 396. Because liability under § 1983 is personal, courts must assess the reasonableness of each defendant's conduct independently. *See **Heartland Acad. Cmty. Church v. Waddle***, 595 F.3d 798, 805-06 (8th Cir. 2010).

The parties do not dispute there was a seizure. The question is whether it was reasonable. This court first considers the factors common to all three deputies: the severity of the security problem; the threat reasonably perceived; and whether Cravener actively resisted. *See **Ryan***, 850 F.3d at 427. Each of the deputies knew Cravener was a paranoid schizophrenic who had not taken his antipsychotic medication, could potentially be dangerous, refused repeated requests to go to the

hospital or lie on his stomach, pretended to shoot himself in the head, took a defensive position lying on the ground with his hands and feet up, and yelled "just shoot me." Thus, the deputies knew there was a reasonable expectation of aggression and a resistant subject.

Turning next to an individualized assessment of each deputy, this court considers: the relationship between the need for the use of force and the amount of force used; the extent of Cravener's injury; and any effort made by the deputy to temper or limit the amount of force. *See id.*

From least force to most, this court begins with Deputy Maggard. He did not use any defensive tactics or weapons on Cravener. His only contact was placing Cravener's right hand in restraints and applying a belly chain and leg shackles. These acts did not cause any injuries. In light of Cravener's resistance to instructions and interventions, this contact was entirely reasonable.

Deputy Shuster did apply the modified bent arm lock that broke Cravener's arm and the nunchucks that resulted in his restraint. However, he did so only after explaining the situation and asking Cravener 20 times to roll over onto his stomach. Deputy Shuster thus made multiple attempts to limit the amount of force. Due to Cravener's repeated refusals to comply with reasonable instructions, Deputy Shuster determined there was a need for force; the use of a standard defensive tactic was reasonable. *See Hicks v. Norwood*, 640 F.3d 839, 842 (8th Cir. 2011) (holding no excessive force where the officer used an "arm-bar maneuver" on a man being booked in prison, who had no weapon but "refused to comply with directions, loudly abused the correctional officers, and aggressively leapt toward" one officer); *Reed v. City of St. Charles*, 561 F.3d 788, 791-92 (8th Cir. 2009) (affirming summary judgment on excessive force claim for officers who used batons and mace against a subject resisting arrest).

The conduct of Deputy Calvin–who tased Cravener five times in drive-stun mode—is the closest call. Like the others, Deputy Calvin observed Cravener refuse multiple orders. Before deploying his taser, Deputy Calvin warned Cravener at least twice that if he did not comply, he would be tased. He also waited until other less intrusive methods—the modified bent arm lock and nunchucks—were used. Deputy Calvin employed his taser only after Cravener yelled "just shoot me," refused to release his arms, and struggled so violently that his arm broke.

This court has granted qualified immunity to officers in similar circumstances where an individual refuses to comply with reasonable orders. *See Ehlers v. City of Rapid City*, 846 F.3d 1002, 1011 (8th Cir. 2017) (holding no constitutional violation where an arrestee was "continuing to lay on his hands and refusing to comply with instructions" because officers "could have interpreted" this "as resistance," "regardless of whether [the man] actually intended to resist"); *Carpenter v. Gage*, 686 F.3d 644, 650 (8th Cir. 2012) (granting qualified immunity to an officer who tased an arrestee who "refused to offer his hands when ordered to do so" and "was warned about the use of the taser" because "[e]ven if Carpenter's motive was innocent, the deputies on the scene reasonably could have interpreted Carpenter's actions as resistance and responded with an amount of force that was reasonable to effect the arrest").

Cravener argues his case is unique because he was not engaged in criminal activity, and thus the force greatly exceeded the need. True, Cravener's lack of criminal activity is an important consideration in the qualified immunity analysis. However, officers may seize a person "in order to ensure the safety of the public and/or the individual, regardless of any suspected criminal activity." *Winters v. Adams*, 254 F.3d 758, 763 (8th Cir. 2001) (holding officers entitled to qualified immunity where they seized a subject without observing any criminal activity). Here, the deputies were called to the house to ensure Cravener's safety. This court has found no excessive force where the subject was not currently engaged in criminal

activity or resisting arrest. *See Ryan*, 850 F.3d at 428 (holding no excessive force where officers twice tased a prisoner (in drive-stun mode) who was being removed from his cell for a medical assessment due to erratic behavior because he was "actively resisting the extraction procedure by ignoring directives to lie down on his bunk and resisting the defendants' efforts to subdue him once they entered his cell").

Cravener also argues the deputies faced no imminent harm because Cravener was unarmed and was passively, not actively, resisting. Even if Cravener were passively resisting, this argument fails. Unarmed, passively resisting subjects can pose a threat necessitating the use of taser force. *See Ehlers*, 846 F.3d at 1011 ("Thus, Ehlers's argument that no force was appropriate because he was being arrested for a nonviolent misdemeanor and was not resisting is inapplicable because he at least appeared to be resisting."); *Carpenter*, 686 F.3d at 650 ("Even if Carpenter's motive was innocent, the deputies on the scene reasonably could have interpreted Carpenter's actions as resistance and responded with an amount of force that was reasonable to effect the arrest.").

B.

Deputy Calvin also is entitled to qualified immunity based on the second inquiry because "even if the reasonableness of [his] actions was questionable," Cravener cannot "show that a reasonable officer would have been on notice that the officers' conduct violated a clearly established right." *De Boise v. Taser Int'l, Inc.*, 760 F.3d 892, 896 (8th Cir. 2014). "When determining whether an action was a clearly established constitutional violation, we look to the state of the law at the time of the incident," here May 2013. *Id.*, *quoting Shekleton v. Eichenberger*, 677 F.3d 361, 366 (8th Cir. 2012). "Particularly, the contours of [Cravener's] right to be free from excessive force must be so sufficiently clear that a reasonable officer would know that the multiple tasings under the circumstances were a violation of that right." *Id.* at 897.

In the *De Boise* case, this court considered "whether a violent subject, acting aggressively toward officers, has a clearly established right to be free from multiple tasings." *Id.* at 897. There, a schizophrenic man's mother called police after her son wandered through the neighborhood naked, claimed to be God, demanded his mother worship him, and "held her head down to the floor." *Id.* at 894. Arriving at the mother's house, officers heard the son screaming, breaking glass, and throwing furniture. *Id.* at 894-95. After he refused officer commands to lie down, they tased him eight times in dart mode and twice in drive-stun mode. He went into cardiac arrest, dying soon after. *Id.* at 894-96. Noting that "in 2008, case law related to the use of tasers was still developing," this court found the officers did not violate any clearly established right because "the state of the law would not have placed an officer on notice that he must limit the use of his taser in certain circumstances, even though the subject continues to struggle and resist." *Id.* at 897 (internal quotation marks omitted).

Although this court decided *De Boise* after the incident here, the case is instructive because it analyzes whether a schizophrenic individual, refusing to comply with repeated officer demands, had a clearly established right to be free from multiple tasings in 2008. There are distinctions between this case and *De Boise*. Significantly, officers arrived at De Boise's house to make a criminal arrest (based on his mother's 911 call reporting violent behavior), while officers arrived at Cravener's for a civil involuntary detention. Additionally, De Boise's behavior (tearing down a screen door, screaming, breaking glass, throwing furniture, clenching his fist) was more aggressive than Cravener's (mimicking shooting himself in the head, holding hands and feet in a defensive position, yelling "just shoot me"). But, there are significant similarities: (1) police receive a phone call from a parent concerned about the erratic behavior of a schizophrenic who had the capacity for violence; (2) officers knew the individual was schizophrenic and had the capacity for violence; (3) the individual demonstrated aggressive behavior in front of officers; (4) the individual failed to comply with repeated officer directions; and (5) the individual continued resisting

after initial taser use. Additionally here, the deputies tried multiple less serious methods of restraining Cravener and gave significant warning before tasing him.

Because of the significant similarities between this case and *De Boise*—with no intervening Eighth Circuit case between 2008 and 2013—*De Boise* controls here. "[N]o reasonable officer, observing [Cravener's] behavior, would have understood the actions taken to be so disproportionate and unnecessary as to amount to a violation of [Cravener's] rights." *Id.* at 897-98. *See **Lash v. Lemke***, 786 F.3d 1, 7 (D.C. Cir. 2015) ("[T]here is no clearly established right for a suspect who actively resists and refuses to be handcuffed to be free from a Taser application."), *quoting **Goodwin v. City of Painesville***, 781 F.3d 314, 325 (6th Cir. 2015); ***Abbott v. Sangamon Cnty.***, 705 F.3d 706, 727 (7th Cir. 2013) ("Courts generally hold that the use of a taser against an actively resisting suspect either does not violate clearly established law or is constitutionally reasonable.").

The district court erred in denying qualified immunity.

III.

For the first time in Cravener's opposition to summary judgment, he raised a failure to intervene claim. The deputies immediately objected. The district court wrote: "In his opposition suggestions, Plaintiff raises a seemingly new claim of 'failure to intervene.' To the extent necessary, the Court analyses this argument in the context of Plaintiff's excessive force claim as alleged." Even if this claim was preserved for appeal, Cravener cannot sustain his failure to intervene claim because the officers did not use excessive force. *See **Hicks***, 640 F.3d at 843 ("[O]ur holding that Captain Norwood did not use excessive force is fatal to Hicks's claims that the remaining defendants unconstitutionally failed to intervene.").

-10-

The district court erred in denying summary judgment on the failure to intervene claim.

\* \* \* \* \* \* \*

The judgment is reversed, and the case remanded for proceedings consistent with this opinion.

_____