# United States Court of Appeals
## For the Eighth Circuit

_____

No. 17-2181

_____

Melanie Kelsay,

*Plaintiff - Appellee,*

v.

Matt Ernst, individually and in his official capacity,

*Defendant - Appellant,*

Jay Welch, individually and in his official capacity; City of Wymore, Nebraska;
Russell Kirkpatrick, individually and in his official capacity; Matthew Bornmeier,
individually and in his official capacity,

*Defendants,*

_____

Appeal from United States District Court
for the District of Nebraska - Lincoln

_____

Submitted: May 16, 2018
Filed: September 27, 2018

_____

Before SMITH, Chief Judge, BEAM and COLLOTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

Melanie Kelsay sued sheriff's deputy Matt Ernst under 42 U.S.C. § 1983, alleging that Ernst used excessive force while arresting Kelsay. The district court denied Ernst's motion for summary judgment, and Ernst appeals on the ground that he is entitled to qualified immunity. We conclude that Ernst did not violate a clearly established right of Kelsay under the Fourth Amendment, so we reverse the order.

The question presented is whether Ernst is entitled to summary judgment, so while there are some disputes about the facts, we ultimately consider the evidence in the light most favorable to Kelsay. On May 29, 2014, Kelsay, her three children, and her friend Patrick Caslin went swimming at a public pool in Wymore, Nebraska. Caslin engaged Kelsay in what she described as "horseplay," but some onlookers thought he was assaulting her, and a pool employee contacted the police.

As Kelsay and her party left the pool complex, they encountered Wymore Police Chief Russell Kirkpatrick and Officer Matthew Bornmeier. Kirkpatrick informed Caslin that he was under arrest for domestic assault and escorted him to a patrol car. Kelsay was "mad" that Caslin was arrested. She tried to explain to the officers that Caslin had not assaulted her, but she thought that the officers could not hear her.

According to Kirkpatrick, Caslin became enraged once they reached the patrol car and resisted going inside. Kirkpatrick says that after he secured Caslin in handcuffs, Kelsay approached the patrol car and stood in front of the door. Kirkpatrick claims that he told her to move three times before Bornmeier escorted her away so that Kirkpatrick could place Caslin into the patrol car.

Kelsay denies approaching the patrol car until after Caslin was inside the vehicle. At that point, while Kirkpatrick interviewed witnesses, she walked over to

the car to talk to Caslin. Bornmeier told her to back away from the vehicle, and Kelsay complied. Two more officers—Deputy Matt Ernst and Sergeant Jay Welch from the Gage County Sheriff's Office—then arrived on the scene. When they appeared, Kelsay was standing about fifteen feet from the patrol car where Caslin was detained, and twenty to thirty feet from the pool's exit doors. Kelsay's younger daughter was standing next to her; her older daughter and son were standing by the exit doors. Kelsay stood approximately five feet tall and weighed about 130 pounds.

Kirkpatrick told Ernst and Welch that Kelsay had interfered with Caslin's arrest. According to Welch, Kirkpatrick explained that Kelsay tried to prevent Caslin's arrest by "trying to pull the officers off and getting in the way of the patrol vehicle door." Kirkpatrick thus decided that Kelsay should be arrested.

In the meantime, Kelsay's older daughter was near the pool exit doors yelling at a patron who the daughter assumed had contacted the police. Kelsay started to walk toward her daughter, but Ernst ran up behind Kelsay, grabbed her arm, and told her to "get back here." Kelsay stopped walking and turned around to face Ernst, at which point Ernst let go of Kelsay's arm. Kelsay told Ernst that "some bitch is talking shit to my kid and I want to know what she's saying," and she continued walking away from Ernst and toward her daughter.

After Kelsay moved a few feet away from Ernst, the deputy placed Kelsay in a bear hug, took her to the ground, and placed her in handcuffs. Kelsay momentarily lost consciousness after she hit the ground. When she regained her senses, she was already handcuffed, and she began screaming about pain in her shoulder.

Ernst drove her to the Gage County jail, but corrections officers recommended that Kelsay be examined by a doctor. Kirkpatrick took Kelsay to a hospital, where she was diagnosed with a fractured collarbone. Kelsay ultimately was found guilty

of two misdemeanor offenses after pleading no contest to attempted obstruction of government operations and disturbing the peace.

Kelsay later sued the City of Wymore and Kirkpatrick, Bornmeier, Ernst, and Welch in their individual and official capacities, alleging wrongful arrest, excessive force, and deliberate indifference to medical needs. The district court granted summary judgment in favor of all defendants on all claims but one. The court ruled that Deputy Ernst was not entitled to qualified immunity on a claim that he used excessive force to arrest Kelsay when he took her to the ground and caused the broken collarbone. The court reasoned that the evidence, viewed in the light most favorable to Kelsay, could lead a factfinder to conclude that Ernst's use of force was unreasonable and violated Kelsay's clearly established rights under the Fourth Amendment.

As an initial matter, Kelsay challenges our jurisdiction over this appeal. We have jurisdiction over an interlocutory appeal of an order denying qualified immunity if the appeal seeks review of a purely legal issue, but we lack jurisdiction to decide "which facts a party may, or may not, be able to prove at trial." *Johnson v. Jones*, 515 U.S. 304, 313 (1995). In this case, Ernst does not challenge any determination of the district court about which facts Kelsay could prove at trial. He raises only the legal question whether the evidence viewed in the light most favorable to Kelsay shows that he violated her clearly established rights under the Fourth Amendment. We have jurisdiction to decide that question. *See Shannon v. Koehler*, 616 F.3d 855, 861 (8th Cir. 2010).

Qualified immunity shields a government official from suit under § 1983 if his "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing

violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). A plaintiff must identify either "controlling authority" or "a robust 'consensus of cases of persuasive authority'" that "placed the statutory or constitutional question beyond debate" at the time of the alleged violation. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741-42 (2011) (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)). In other words, the law at the time of the events in question must have given the officers "fair warning" that their conduct was unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

The state of the law should not be examined at a high level of generality. "The dispositive question is whether the violative nature of *particular* conduct is clearly established." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (internal quotation marks omitted). "Such specificity is especially important in the Fourth Amendment context, where . . . it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Id.* (internal quotation marks omitted).

In this case, Kelsay alleged that the takedown maneuver violated her right under the Fourth Amendment to be free from excessive force. The district court rejected Ernst's defense of qualified immunity. The court reasoned that where a nonviolent misdemeanant poses no threat to officers and is not actively resisting arrest or attempting to flee, an officer may not employ force just because the suspect is interfering with police or behaving disrespectfully. *See Shekleton v. Eichenberger*, 677 F.3d 361, 366-367 (8th Cir. 2012); *Montoya v. City of Flandreau*, 669 F.3d 867, 871-72 (8th Cir. 2012); *Johnson v. Carroll*, 658 F.3d 819, 827 (8th Cir. 2011); *Shannon*, 616 F.3d at 864-65; *Brown v. City of Golden Valley*, 574 F.3d 491, 499 (8th Cir. 2009); *Kukla v. Hulm*, 310 F.3d 1046, 1050 (8th Cir. 2002). The court ruled that the excessiveness of Ernst's use of force would have been apparent to a reasonable officer, because while Kelsay "was not precisely 'compliant'—that is, she had been told to stop but kept walking instead—she was not using force or actively resisting arrest, and posed no danger to anyone."

We respectfully disagree with this conclusion. It was not clearly established in May 2014 that a deputy was forbidden to use a takedown maneuver to arrest a suspect who ignored the deputy's instruction to "get back here" and continued to walk away from the officer. We held in *Ehlers v. City of Rapid City*, 846 F.3d 1002 (8th Cir. 2017), that an officer did not violate the Fourth Amendment by executing a takedown of a nonviolent misdemeanant when the officer twice ordered the suspect to place his hands behind his back, but the suspect continued walking away. *Id.* at 1011. The court concluded that a reasonable officer would interpret the subject's behavior as "noncompliant," and reasoned that he "at least appeared to be resisting" when he continued to walk away, so the officer was "entitled to use the force necessary to effect the arrest." *Id.* Under Kelsay's version of the facts, Ernst told Kelsay only once to "get back here" before she continued to walk away, but even if there might be a constitutionally significant distinction between one command and two, no such rule was clearly established when Ernst made his arrest. None of the decisions cited by the district court or Kelsay involved a suspect who ignored an officer's command and walked away, so they could not clearly establish the unreasonableness of using force under the particular circumstances here. The constitutionality of Ernst's takedown was not beyond debate, and he is thus entitled to qualified immunity.

The dissenting opinion concludes that *Ehlers* is obviously distinguishable by relying on a *different* section of the decision concerning whether a *different* officer had probable cause to arrest the suspect. Because the officer who directed the arrest in *Ehlers* reasonably interpreted the suspect's behavior as "threatening," *id*. at 1009, the dissent apparently concludes that the second officer's use of force against the suspect was reasonable only because the suspect posed a threat. But this was not the court's rationale. *Ehlers* explained that the arresting officer reasonably executed a takedown of the suspect, a "nonviolent" misdemeanant, because he ignored two commands and "at least appeared to be resisting." *Id*. at 1011. The opinion did *not* rely on threatening behavior by the suspect to justify the takedown. Indeed, there is

nothing in the opinion to show that the arresting officer was even aware that the suspect posed a threat to the first officer. The first officer simply told the arresting officer to "[t]ake this guy, he's not listening." *Id*. at 1010. A reasonable officer thus could interpret *Ehlers* to mean that it is reasonable to execute a takedown when a nonviolent misdemeanant ignores two commands. If that was the law in 2017, then it was not obvious or beyond debate in 2014 that an officer was forbidden to execute a takedown when a nonviolent misdemeanant ignored one command.

For these reasons, the order of the district court denying qualified immunity is reversed.[1]

BEAM, Circuit Judge, concurring.

I concur in the court's reversal of this matter. But, I do so somewhat advisedly because of the extant but confusing precedent available to the district court at that time. And, speaking parenthetically, the slamming of this lady to the ground by the deputy with force sufficient to fracture her shoulder was uncalled for given the nature of the encounter underway.

SMITH, Chief Judge, dissenting.

I respectfully dissent. The court rightfully concludes that in May 2014, case law did not clearly establish "that a deputy was forbidden to use a takedown maneuver to arrest a suspect who ignored the deputy's instruction to 'get back here'

---

[1]Kelsay also appears to contend that Ernst violated her Fourth Amendment rights by failing to remove handcuffs despite her repeated complaints of shoulder pain. The district court did not address this claim, and Ernst does not appeal any ruling about it. Accordingly, we do not consider whether Kelsay properly presented this claim in the district court or, if so, whether it would survive a motion for summary judgment.

and continued to walk away from the officer." *Supra* p. 6. But, "in an obvious case," the clearly-established prong can be met "even without a body of relevant case law." *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam) (citing *Hope*, 536 U.S. at 738; *Pace v. Capobianco*, 283 F.3d 1275, 1283 (11th Cir. 2002)). Prior case law is unnecessary where "a general constitutional rule already identified in the decisional law [applies] with obvious clarity to the specific conduct in question." *Capps v. Olson*, 780 F.3d 879, 886 (8th Cir. 2015) (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)). This is such a case.

Kelsay was a small woman standing at 5 feet tall and weighing 130 pounds dressed in a swimsuit. She acknowledged that Deputy Ernst grabbed her arm and "said to get back here." *Kelsay v. Ernst*, No. 4:15-CV-3077, 2017 WL 5953112, at *2 (D. Neb. May 19, 2017) (citation to the record omitted). But, according to Kelsay, she walked away from the deputy to check on her daughter. She denied resisting Deputy Ernst's efforts to handcuff or arrest her. Nevertheless, Deputy Ernst "ran up behind [Kelsay] and he grabbed [her] and slammed [her] to the ground." *Id.* (second and third alterations in original) (citation to the record omitted). The maneuver—"like, a bear hug"—lifted Kelsay "completely off the ground." *Id.* (citation to the record omitted). Due to the ground impact, Kelsay briefly lost consciousness. Deputy Ernst's takedown maneuver broke Kelsay's collarbone.

Kelsay's and Deputy Ernst's versions of factual events materially differ, but at this stage of the litigation, Kelsay gets the benefit of all reasonable inferences. The record did not reflect that Kelsay was a threat, physical or otherwise, to either the officers or bystanders. Deputy Ernst's bear-hug takedown could be found by a jury to be unreasonable under the circumstances. "Police officers undoubtedly have a right to use *some* degree of physical force, or threat thereof, to effect a lawful seizure, and reasonable applications of force may well cause pain or minor injuries with some frequency." *Grider v. Bowling*, 785 F.3d 1248, 1252 (8th Cir. 2015) (emphasis added) (quoting *Chambers v. Pennycook*, 641 F.3d 898, 907 (8th Cir. 2011)). But it should

be obvious that a blind body slam of a comparatively slightly built and nonviolent misdemeanant unreasonably increased the probability of injury. The amount of force applied was unreasonable and was more than what was reasonably necessary to effectuate an arrest under the circumstances.

The Court relies on *Ehlers*, but *Ehlers* is distinguishable. In *Ehlers*, we concluded that

> [a] reasonable officer in Hansen's position would at least consider the possibility that Ehlers could produce a weapon or otherwise attack him, especially given that Ehlers had directly disobeyed unequivocal orders, was in close proximity to Hansen, and continued to approach Hansen while he was arresting Ehlers's son. In order to continue to place Derrik in the patrol car, Hansen would have had to turn his back to Ehlers and leave himself vulnerable to this risk. Thus, it is not unreasonable that Hansen would interpret Ehlers's physical presence, close proximity, and refusal to comply as threatening and preventing him from completing the task at hand.

846 F.3d at 1009. In contrast to *Ehlers*, Kelsay did not have a weapon or access to one; she was walking *away* from Deputy Ernst; she disobeyed Deputy Ernst's order once; and Deputy Ernst did not have to place himself in a vulnerable position. Moreover, in contrast to the officer in *Ehlers*, Deputy Ernst gave Kelsay *no* warning[2] after she turned her back and walked away from him. Deputy Ernst simply tackled her from behind. The officers in *Ehlers* reasonably interpreted the arrestee's "physical presence, close proximity, and refusal to comply as threatening." *Id.* at 1009. No facts in the instant case support a reasonable belief that Kelsay's actions were threatening.

---

[2]Deputy Ernst told Kelsay to "get back here," *Kelsay*, 2017 WL 5953112, at *2, but that order occurred before Kelsay turned her back to the deputy and continued walking away.

Given the facts, a reasonable officer on the scene would have known that a full-body takedown of a small and nonviolent misdemeanant was excessive under the circumstances. Deputy Ernst was entitled to use the force necessary to effect an arrest. However, a jury might decide that Deputy Ernst used substantially more force than necessary. *See Small v. McCrystal*, 708 F.3d 997, 1005 (8th Cir. 2013) ("It was unreasonable for [an officer] to use more than de minimis force against [the arrestee] by running and tackling him from behind without warning." (citing *Shannon*, 616 F.3d at 863; *Bauer v. Norris*, 713 F.2d 408, 412–13 (8th Cir. 1983))); *see also Morelli v. Webster*, 552 F.3d 12, 24 (1st Cir. 2009) ("Here, the facts, seen through the prism of the plaintiff's account, simply do not justify yanking the arm of an unarmed and non-violent person, suspected only of the theft of $20, and pinning her against a wall for three to four minutes with sufficient force to tear her rotator cuff. That is particularly so in view of the marked disparity in height and weight between the officer and the suspect, the absence of any evidence of either dangerousness or attempted flight, and the presence of a cadre of other officers at the scene. In short, the plaintiff's version of the relevant facts places Webster's actions outside the universe of protected mistakes." (citations omitted)); *Solomon v. Auburn Hills Police Dep't*, 389 F.3d 167, 175 (6th Cir. 2004) ("[T]he officers here were not faced with a tense and uncertain situation where they feared for their safety and the safety of bystanders. . . . Officer Miller then shoved [the arrestee] into the [theater] display case, putting his entire weight—nearly twice the amount of her own weight—against her. Finally, without directing Solomon to act, he yanked her arm behind her with such force that it fractured. Officer Miller's actions, in total, were excessive and resulted in Solomon suffering from bruising and a fractured arm.").

Officer Ernst did not need to be put on notice by a prior case with the instant facts to know that his conduct could be challenged as unreasonable.

For these reasons, I respectfully dissent.

_____

-10-