# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-1517

_____

| | | |
|---|---|---|
| Northern States Power Company, doing business as Xcel Energy, | * * * | |
| Plaintiff-Appellant, | * * | |
| v. | * * | |
| Federal Transit Administration; | * | |
| | * | Appeal from the United States |
| Defendant, | * | District Court for the |
| | * | District of Minnesota. |
| Minnesota Department of Transportation; Elwyn Tinklenberg, Commissioner of Transportation, individually and officially; Minnesota Metropolitan Council; State of Minnesota, | * * * * * * | |
| Defendants-Appellees. | * | |

_____

Submitted: December 17, 2003

Filed: February 20, 2004

_____

Before WOLLMAN, LAY, and RILEY, Circuit Judges.

_____

LAY, Circuit Judge.

The Minnesota Department of Transportation ("MnDOT") ordered Northern States Power, doing business as Xcel Energy ("Xcel"), to relocate its underground utility facilities beneath Fifth Street in downtown Minneapolis to make way for the Hiawatha Light Rail Transit project ("LRT"). Xcel filed suit for declaratory and injunctive relief, contesting MnDOT's authority to give such an order and asserting that it was entitled to the costs of relocation of its facilities. The district court dismissed Xcel's claims against all Defendants on summary judgment, holding that MnDOT had the authority to order relocation and that Xcel must pay for the relocation of its utility facilities. Xcel appeals, and we affirm.

## I. BACKGROUND

Xcel supplies electricity to the City of Minneapolis ("City"). Many of the facilities necessary for the distribution of electricity to downtown consumers are located beneath Fifth Street. Xcel's right to use Minneapolis streets for its facilities is secured by a Franchise Agreement with the City. Xcel pays the City over $15 million per year for the franchise.

The LRT is an 11.6 mile light rail train project connecting downtown Minneapolis, the Minneapolis/St. Paul International Airport, and the Mall of America, a large-scale commercial shopping center located in the nearby suburb of Bloomington, Minnesota. The downtown section of the LRT route includes a portion of Fifth Street. MnDOT, a state agency, is responsible for design and construction of the project. Upon completion, the LRT will be owned and operated by the Minnesota Metropolitan Council ("Met Council"), a public corporation and political subdivision of the state. The LRT project will cost an estimated $675.4 million, $334 million of which is to be funded by the Federal Transit Administration ("FTA"), an agency within the United States Department of Transportation.

In order to accommodate the LRT, Xcel's Fifth Street facilities needed to be relocated. On November 29, 2000, MnDOT ordered Xcel to submit a plan and schedule for relocation of its facilities within thirty days, cautioning that all relocation work must be completed by February 1, 2002. Although the thirty-day deadline was later extended, Xcel did not submit a plan to relocate. Instead, Xcel filed suit in federal district court[1] against the FTA, the Met Council, MnDOT, the State of Minnesota, and the Commissioner of MnDOT, Elwyn Tinklenberg. Xcel's Complaint alleged that: 1) the FTA was required by law to submit a supplemental Environmental Impact Statement, reflecting MnDOT's intention to "pave over" Xcel's facilities; 2) MnDOT, Met Council, and Tinklenberg violated Xcel's procedural due process, substantive due process, and equal protection rights, and also effected an unconstitutional taking; 3) MnDOT, Met Council, and Tinklenberg violated Xcel's right to reimbursement under the Franchise Agreement and Minn. Stat. § 161.46; and 4) MnDOT's order to relocate was an invalid exercise of state power.

Thereafter, in order to keep the LRT project on schedule, the Defendants moved for a preliminary injunction to compel Xcel to relocate its facilities in one part of Fifth Street. The district court granted the injunction, N. States Power Co. v. Fed. Transit Admin., Civ. No. 01-295, 2001 WL 1618532 (D. Minn. May 24, 2001) (unpublished), and this court upheld the decision on appeal. N. States Power Co. v. Fed. Transit Admin., 270 F.3d 586 (8th Cir. 2001).[2]

---

[1]The Honorable John R. Tunheim, United States District Judge for the District of Minnesota.

[2]This preliminary injunction only concerned that part of Fifth Street to the east of Nicollet Avenue. MnDOT subsequently ordered Xcel to also move its facilities for that part of Fifth Street to the west of Nicollet Avenue, establishing a deadline that was later found to be "unreasonable" by the Minnesota Court of Appeals. See N. States Power Co. v. Minn. Dep't of Transp., 2002 WL 2004718 (Minn. Ct. App., Sept. 3, 2002) (unpublished). It appears, however, that despite this ruling, Xcel has gone ahead with the work needed to relocate its facilities to the west, as well as the east, of Nicollet Avenue.

Following discovery, all Defendants moved for summary judgment. On September 10, 2002, the district court granted summary judgment, dismissing all of Xcel's claims. The district court held that: 1) Xcel's claim against the FTA was moot because the facility relocation was either completed, or in the process of being completed, and therefore there was no longer a threat that MnDOT would "pave over" Xcel's facilities; 2) MnDOT had the authority to exercise the state's police powers to order Xcel to relocate its facilities; 3) neither Minn. Stat. § 161.46 nor the Franchise Agreement provided for reimbursement under these circumstances; 4) Xcel failed to plead the issue of whether MnDOT's regulations were unreasonable; 5) Xcel's constitutional claims were without merit; and 6) the Eleventh Amendment barred claims against MnDOT Commissioner Tinklenberg.

Xcel now appeals the following issues from the district court's grant of summary judgment: 1) that its Franchise Agreement with the City establishes a right to reimbursement; 2) that MnDOT lacks the authority to exercise the state's police powers to order Xcel to remove its facilities; 3) that its Complaint satisfied notice pleading requirements, asserting MnDOT's regulations were unreasonable; 4) that its due process and takings claims are valid; and 5) that its claims against Commissioner Tinklenberg are not barred by the Eleventh Amendment.

## II. DISCUSSION

A. *Standard of Review*

We review the district court's grant of summary judgment *de novo*. Girten v. McRentals, Inc., 337 F.3d 979, 981 (8th Cir. 2003). We must view the record in the light most favorable to Xcel, and give Xcel the benefit of all reasonable inferences. Viking Supply v. Nat'l Cart Co., 310 F.3d 1092, 1096 (8th Cir. 2002).

B. *Cost of Relocation*

The Supreme Court has clearly stated that "[u]nder the traditional common-law rule, utilities have been required to bear the entire cost of relocating from a public right-of-way whenever requested to do so by state or local authorities." Norfolk Redevelopment and Hous. Auth. v. Chesapeake & Potomac Tel. Co. of Va., 464 U.S. 30, 35 (1983) (citing New Orleans Gas Light Co. v. Drainage Comm'n of New Orleans, 197 U.S. 453, 462 (1905)). Minnesota courts recognize the same rule. See Stillwater Co. v. City of Stillwater, 52 N.W. 893, 894 (Minn. 1892); N. States Power Co. v. City of Oakdale 588 N.W.2d 534, 542 (Minn. Ct. App. 1999) (holding that no compensation was due to the utility company in light of "the long-held view that a city may regulate a utility without compensation in valid exercise of its police power").

Xcel seeks to avoid this undisputed precedent by focusing on the Franchise Agreement. Xcel maintains that § 7 of that agreement specifically provides for payment of relocation costs to Xcel under these circumstances. It states in relevant part:

> Except where required solely for a City improvement project, the vacation of any public way, after the installation of electric facilities, shall not operate to deprive [Xcel] of its rights to operate and maintain such electrical facilities, until the reasonable cost of relocating the same and the loss and expense resulting from such relocation are first paid to [Xcel].

(Appellant's App. at 811.) Xcel argues that this express contractual provision in the Franchise Agreement "overrides" the common law rule, and therefore the district court's reliance on New Orleans Gas Light was reversible error.

Xcel's arguments are not persuasive. Even assuming that the Franchise Agreement is controlling and creates a legal right that could be enforced against the

Defendants,[3] it does not provide for reimbursement under these circumstances because the City did not vacate Fifth Street.

The district court was correct to note that under the Minneapolis Charter and the Ordinances, vacation is a formal act of the Minneapolis City Council. Chapter 8, Section 3 of the Minneapolis Charter provides that vacation may only occur upon a two-thirds vote of the City Council:

> **Section 3. Vacation of Streets.** The City Council may also by a vote of two-thirds of the members thereof vacate any highway, street, lane or alley, or portion of either and such power of vacating highways, streets, lanes and alleys within the City of Minneapolis is vested exclusively in said City Council, and no court or other body, or authority shall have any power to vacate any such highway, street, lane or alley, nor any plat or portion of any plat of lands within said City.

Minneapolis, Minn., City Charter ch. 8, § 3. Likewise, the Minneapolis City Ordinances[4] require that a number of formal steps be taken before vacation may occur, including: 1) the referral of any proposed vacation to the planning commission for investigation and report; 2) an investigation and a report and recommendation by the commission on the proposed vacation; 3) a public hearing, if thought necessary

_____

[3]Because we hold that the Franchise Agreement does not provide for reimbursement to Xcel under these circumstances, we do not need to decide two additional issues raised by the Defendants that present potential obstacles to the relief Xcel seeks: 1) whether any of the Defendants can be held liable for relocation costs under the terms of a contract to which none of them is a party; and 2) in light of the established principle of municipal law that, as a creature of the state, a municipality cannot bind or control the state without the express consent of the state, see Watson Constr. Co. v. City of St. Paul, 109 N.W.2d 332, 334 (Minn. 1961), whether the Franchise Agreement is even relevant to MnDOT's exercise of police powers expressly delegated to it by the state.

[4]Chapter 433 of the Minneapolis City Ordinances specifically cross references the City Council's power to vacate under Chapter 8, Section 3 of the City Charter.

by either the City Council or the planning commission; 4) an application, including a plat specifically delineating the right-of-way to be vacated, filed with the City Clerk by the person or entity requesting vacation; and 5) a $300 application fee to be paid by the person or entity requesting vacation. Minneapolis, Minn., Code of Ordinances ch. 433 §§ 433.10 to 433.50. Only after these steps are taken may the City vacate a public way under the City Ordinances. See id. It does not appear that these steps were taken in this case.

The district court was also correct to note that Minnesota courts have identified vacation to be a formal act which releases the public's entire interest in the right-of-way, reverting ownership of the land occupied by the street to the abutting landowners. See McCuen v. McCarvel, 263 N.W.2d 64, 65-66 (Minn. 1978) (explaining that, upon vacation, the land occupied by the right-of-way reverts to the fee owners of the land next to the right of way); In re Hull, 204 N.W. 534, 537 (Minn. 1925) ("The vacation of a street has several consequences[,]" including "releas[ing] the estates of abutting landowners from the public easement in the land between the street lines."); Lamm v. Chicago, St. P., M. & O. Ry. Co., 47 N.W. 455, 458 (Minn. 1890) (stating that vacating a street constitutes "giving up and releasing the entire interest of the public in it").

Xcel argues that the City Council *did* satisfy the formal procedures for vacating the street by voting 12-0 for vacation. A close review of the record, however, reveals that the issue of vacation was never before the City Council. The vote to which Xcel refers in its brief is simply a vote to authorize City officers to execute a "Construction Cooperation Agreement." (Appellant's App. at 1614-15.) Again, there was no evidence that the vacation procedures were followed here.

Xcel also argues that the word vacation is not capitalized in the Franchise Agreement, and it should therefore be interpreted under its normal meaning and not by reference to any formal procedure. This argument is not particularly convincing, given that "vacation" is not capitalized in the Charter or Ordinances either. Also, the

vacation procedures, which have been in place since at least 1960, were surely known to both parties. It stands to reason that the City was familiar with its own Charter and Ordinances, and that Xcel was familiar with the concept of vacation through its extensive dealings with City rights-of-way.

Even if Xcel is correct that the parties were not referring to any formal vacation procedure, we hold that under the plain meaning of the word, the City did not "vacate" Fifth Street. Dictionary definitions of the word "vacate" include: "to deprive of an incumbent or occupant," Merriam Webster's Collegiate Dictionary 1380 (11th ed., Merriam Webster, Inc. 2003); "to give up possession or occupancy of . . . to give up or relinquish . . . to cause to be empty or unoccupied," Random House Webster's College Dictionary 1442 (2nd rev., Random House 2001); "[t]o cease to occupy or hold; give up," The American Heritage Dictionary of the English Language 1969 (3d. ed., Houghton Mifflin Co. 1996). The City has never fully "given up" its interest in the street. For instance, the City has always owned and will continue to own the street. The fact that the Met Council will operate and maintain the LRT does not change this fact. Furthermore, given that Fifth Street is a public right-of-way, the City never really physically "occupied" the street. Thus, Xcel's arguments that the City "ceased to occupy" Fifth Street when MnDOT constructed the LRT do not persuade us. The City continued to "occupy" the street to the same extent as it did before the LRT, insofar as it maintained its interest in the street. The only difference is that it cooperated with the state for the construction of LRT on part of the street.

Xcel insists that the City fully relinquished its interest in the street because it "conveyed" the street to MnDOT pursuant to a "Cooperation Agreement," to which the City was a party. (Appellant's App. at 1524-43.) However, the actual language of that agreement states only that the City "convey access to or interest in" the street to the extent necessary for the construction and operation of the LRT. (Id. at 1529.) Contrary to Xcel's arguments, the City only partly relinquished control over the street in order to allow the construction and operation of the LRT tracks. We hold that this

partial relinquishment of the City's interest in Fifth Street to collaboratively and cooperatively encourage the construction of a public project is not a "vacation" within any meaning of that term. This is especially true given that Fifth Street will continue to be open for vehicle and pedestrian traffic (under control of the City) even after the LRT is operational.

Xcel argues that, at a minimum, § 7 of the Franchise Agreement is ambiguous and therefore presented an issue of fact for the jury that precludes summary judgment. For the reasons stated above, however, we find that the Franchise Agreement is not ambiguous. The district court was therefore correct to decide the issue as a matter of law on summary judgment. See Brookfield Trade Ctr., Inc. v. County of Ramsey, 584 N.W.2d 390, 394 (Minn. 1998) ("The construction and effect of a contract presents a question of law, unless an ambiguity exists.").

In summary, the Franchise Agreement does not provide for relocation costs to Xcel under these circumstances. Therefore, Xcel must bear the cost of relocation of its facilities under the traditional common law rule.

C. *MnDOT's Authority*

Xcel argues that the district court erroneously read Minn. Stat. § 174.35 to vest MnDOT with the police power necessary to create the LRT. That statute provides "[t]he commissioner of transportation may exercise the powers granted in this chapter and chapter 473, as necessary, to plan, design, acquire, construct, and equip light rail transit facilities in the metropolitan area as defined in section 473.121, subdivision 2." Minn. Stat. § 174.35. It is not disputed that as a state agency, MnDOT can only exercise the police powers delegated to it by the state. See Peoples Natural Gas Co. v. Minn. Pub. Utils. Comm'n, 369 N.W.2d 530, 534 (Minn. 1985). Xcel argues that MnDOT's authority under the chapters listed in the above statute are limited only to "trunk highways" and not to city streets, see Minn. Stat. §§ 160.02, subd. 25 and

160.01; Minn. R. 8810.3300, subd. 3, and therefore MnDOT did not have the power to order Xcel to move its facilities out of Fifth Street.

This is not the correct meaning of § 174.35. The plain language of § 174.35 is itself a delegation of police power to the MnDOT Commissioner to "plan, design, acquire, construct, and equip" the LRT line wherever the project would be located "in the metropolitan area." This plain meaning is supported by the context in which the statute was enacted. When the legislature enacted this statute in 1993, the FTA's 1985 Environmental Impact Statement showed that a portion of the proposed route would not include trunk highways. (Appellant's App. at 102-106.) We find it unlikely that, given the breadth of the delegation of power to MnDOT under the plain meaning of § 174.35, the legislature intended to limit the Commissioner's power in such a way to make it impossible for him to construct the LRT as planned. Instead, we agree with the district court that:

> For Xcel to argue that these statutes and regulations apply only to trunk highways ignores the very purpose of the legislation: to permit MnDOT to use its existing highway authority to create LRT. The legislature is free to extend the application of existing rules by statute, and that is precisely what it did when authorizing LRT under Minn. Stat. § 174.35.
>
> . . . .
>
> . . . The Court is persuaded that the Minnesota legislature expressly granted authority and police power to MnDOT to create the LRT project, and that this authority sufficiently empowered the department to order relocation of the Fifth Street utilities at Xcel's own expense.

N. States Power Co. v. Fed. Transit Admin., 2002 WL 31026530 at *9, 10 (D. Minn. Sept. 10, 2002) (unpublished). Accordingly, we find that MnDOT and Commissioner Tinklenberg possessed the power to order relocation of Xcel's facilities from Fifth Street.

D. *Reasonableness of Regulations*

Xcel argues that its claim that MnDOT's regulations were unreasonable under Minn. Stat. § 222.37 and Minn. R. 8810.3300 was stated sufficiently in its Complaint to satisfy the liberal notice pleading standards of the Federal Rules of Civil Procedure. We believe, however, that the district court was correct to disregard this claim.

Rule 8(a) of the Federal Rules of Civil Procedure provides that pleadings must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). The essential function of notice pleading "is to give the opposing party fair notice of the nature and basis or grounds for a claim, and a general indication of the type of litigation involved." Oglala Sioux Tribe of Indians v. Andrus, 603 F.2d 707, 714 (8th Cir. 1979). We do not believe that Xcel has met even this low standard.

Xcel's Complaint fails to mention the relevant legal standards that provide a basis for their claim: Minn. Stat.§ 222.37 (providing that utilities that use public roads for their lines will be subjected only to "reasonable regulations") and Minn. R. 8810.330 (providing that MnDOT's deadlines must be "reasonable under the circumstances"). The Complaint also fails to identify any MnDOT regulations as unreasonable and, for that matter, does not even contain the word "unreasonable." There is simply nothing alleged in the Complaint that would have notified the Defendants of this claim. This is especially true given that Xcel appears to have made the tactical decision to pursue its "reasonableness" arguments in state court, instead of federal court. See N. States Power Co. v. Minn. Dep't of Transp., 2002 WL 555163 (Minn. Ct. App. April 16, 2002) (unpublished); N. States Power Co. v. Minn. Dep't of Transp., 2002 WL 2004718 (Minn. Ct. App. Sept. 3, 2002) (unpublished). The assertion of this claim on the eve of summary judgment also weighs against Xcel. Courts regularly deny motions to amend under these circumstances, see Overseas Inns S.A. P.A. v. United States, 911 F.2d 1146, 1150-51 (5th Cir. 1990) (upholding district

-11-

court's decision to refuse leave to amend complaint when party sought to add a claim in an effort to avoid summary judgment), and we believe that the same rationale applies here.

Thus, while we recognize that the pleading requirements under the Federal Rules are relatively permissive, they do not entitle parties to manufacture claims, which were not pled, late into the litigation for the purpose of avoiding summary judgment.

E. *Constitutional Claims*

Xcel also argues on appeal that the district court erred in holding that there was no unconstitutional taking by the Defendants.[5] Xcel points to a number of cases in which courts have held that franchise agreements constitute constitutionally-protected property rights, the taking of which requires just compensation. See, e.g., N.Y. Elec. Lines Co. v. Empire City Subway Co., 235 U.S. 179, 192 (1914). As the district court pointed out, however, "Xcel's franchise with the City remains undamaged; Xcel merely had to move its facilities from one portion of the street to another, and such regulation is well within the state's police powers." N. States Power Co., 2002 WL 31026530 at *14. Xcel protests on appeal that the district court's decision ignores the fact that it was deprived of its right to compensation for relocation under § 7 of the Franchise Agreement. As discussed above, however, the district court correctly found that § 7 does not provide for compensation under these circumstances. Thus, there was no unconstitutional taking.

---

[5]Because Xcel provides no separate due process argument, we will assume that Xcel's references to the Defendants' "violation of Xcel Energy's due process rights" is simply a recognition of the fact that the takings clause of the Fifth Amendment is incorporated by, and applied against the states through, the due process clause of the Fourteenth Amendment.

F. *Commissioner Tinklenberg*

Finally, it is not necessary to reach the issue of whether the district court properly decided that Xcel's claims against Commissioner Tinklenberg violated the Eleventh Amendment under the reasoning of Pennhurst v. Halderman, 465 U.S. 89 (1984). Analysis of whether Tinklenberg was a proper defendant would be extraneous, given that we conclude that the district court's dismissal of all claims against all Defendants on summary judgment was correct. See In re Snyder, 472 U.S. 634, 642 (1985) ("We avoid constitutional issues when resolution of such issues is not necessary for disposition of a case.").

## III. CONCLUSION

For the reasons stated above, the decision of the district court is AFFIRMED.

_____