# United States Court of Appeals
## For the Eighth Circuit

_____

No. 17-2527

_____

Brittany A. Karels

*Plaintiff - Appellee*

v.

Gabriel A. Storz, acting in his individual capacity as an officer of the Big Lake
Police Department

*Defendant - Appellant*

Samuel J. Norlin, acting in his individual capacity as an officer of the Big Lake
Police Department

*Defendant*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: June 12, 2018
Filed: October 15, 2018

_____

Before WOLLMAN, ARNOLD, and STRAS, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Brittany Karels brought an action under 42 U.S.C. § 1983 against Gabriel Storz and Samuel Norlin, in their individual capacities as officers of the Big Lake, Minnesota, Police Department. Karels alleged, *inter alia*, that the officers used excessive force in effectuating her arrest in violation of her Fourth Amendment rights. After the officers moved for summary judgment, Karels withdrew her claim against Norlin. As relevant here, the district court[1] determined that Storz was not entitled to qualified immunity on the excessive force claim and denied summary judgment as to Storz. We affirm.

## I.  Background

Karels rented a room in the basement of Jennifer and Robert Owens' multilevel home in Big Lake, Minnesota. The house has an attached garage with two steps leading from the garage into the house. Karels is five feet, five inches tall and has described herself as being out of shape. At the time of her arrest, she weighed approximately 185 pounds and smoked cigarettes regularly.

On Friday, March 27, 2015, Karels drank a six-pack of beer after putting her five-year-old son to bed. Later that night, Jennifer reluctantly agreed to watch Karels's son while Karels went to purchase cigarettes.

Karels left the house around 1:30 a.m. on March 28. After she purchased cigarettes, Karels stopped at a bar in a nearby town, where she had two shots of liquor and smoked marijuana in the parking lot. Karels took a taxi home sometime after 2:30 a.m. and discovered that Jennifer had gone out to look for her. Karels called Jennifer, who soon returned to the house. The two women began arguing loudly outside the house. When the still-arguing women entered the house, Robert told

---

[1]The Honorable David S. Doty, United States District Judge for the District of Minnesota.

Karels to go to her room. As the women continued to argue, he called 911 to report Karels as "a drunk that's being ignorant." He gave the dispatcher the address to his home and described Karels as "a friend living here."

Officers Storz and Norlin were dispatched to the scene. At that time, Storz had been a police officer for approximately ten months. He was thirty-three years old, more than six feet tall, and physically fit. Norlin also was tall and fit.

Karels and Jennifer were still arguing in the house when Storz and Norlin arrived. The Owenses told the officers that they did not feel threatened by Karels, but that they wanted her to go to her room because she had been drinking and was being argumentative. Storz spoke to Karels outside as she smoked a cigarette. Karels cursed loudly, but then lowered her voice upon being instructed by Storz to do so. After Karels told Storz her side of the story, they returned to the house.

Storz then asked Karels for her identification. Karels did not remember whether she complied with his first request, but she testified that when she handed her driver's license to Storz, he poked her in the collarbone repeatedly and yelled, "calm down" or "back off." Karels then demanded to speak to the supervising officer. When the officers informed her that there was no supervisor on duty, Karels went into the garage to smoke another cigarette. Norlin followed her, while Storz remained in the house.

While in the garage, Karels called 911 twice to request a police sergeant or a deputy sheriff. According to the call transcripts, Karels told the dispatcher that two Big Lake police officers would not leave her alone and had assaulted her. The dispatcher told Karels that there was nothing she could do and that Karels could file a complaint with the police chief on Monday morning. It is undisputed that Karels was yelling and cursing at the dispatcher during the 911 calls.

-3-

During the second call, dispatch relayed to the officers that Karels kept calling 911 and making demands. After dispatch asked whether the officers planned to arrest Karels, Storz exited the house, went down the concrete steps, and entered the garage, where Karels was holding a lit cigarette in her right hand. An empty coffee can that served as an ashtray was located near the steps. Storz informed Karels that she was under arrest and instructed her to put her hands behind her back.

According to Karels, Storz quickly grabbed her left wrist and brought it behind her back. Karels tried to tell the officers that she was going to put the cigarette in the coffee can. She testified that Norlin had grabbed her right wrist, guiding it toward the coffee can, and away from Storz, so that she could dispose of the cigarette. As Storz felt Karels pull away from him, he commanded her to stop resisting arrest, to which Karels responded, "I've got a lit cigarette in my hand." Immediately after Norlin extinguished the cigarette and as she was reaching toward the coffee can, Storz twisted her left arm behind her and body-slammed her onto the concrete steps, causing Norlin to lose his grip on her wrist. She felt her left arm "twisted up almost where the bra strap line would be." Karels landed on her left side and felt searing pain in her left arm. Her glasses flew off her face. The back of her head hit the door, which slammed open and then shut, hitting Karels a second time. Storz landed on the ground next to her. Karels testified that mere seconds passed between the time Storz entered the garage to the time he slammed Karels onto the ground.

Storz disputes Karels's account of events leading up to his use of force, citing evidence that Karels was loud, aggressive, argumentative, and resistant. According to Storz, upon being informed that she was being arrested for disorderly conduct, Karels retorted that she would not do anything until she finished smoking her cigarette. Norlin then extinguished the cigarette and the officers grabbed hold of Karels's wrists. Storz was able to place Karels's left wrist in handcuffs. When Karels began swinging her shoulders, trying to pull her arms away from the officers, she lunged forward and broke Norlin's grip from her right arm. By that time, Storz

held only the handcuffs that were secured to Karels's left wrist and had no hold of her left arm. Storz's incident report states that he and Karels tripped over a concrete step as Karels pulled away from him, and that they then fell to the ground.

The officers placed Karels in handcuffs, pulled her to a standing position, and escorted her to the squad car. When they searched Karels, they found a marijuana pipe and a small amount of marijuana.

Karels complained repeatedly about her left arm. She later described the pain as feeling "like a very strong vise clamping down on my upper left arm." She thought that she was being restrained in a new style of handcuffs that secured the upper arm, so she repeatedly asked the officers to move or loosen the handcuffs. Karels requested medical attention, but refused to allow the paramedics to examine her when an ambulance arrived.

Norlin transported Karels to the county jail, where she continued to complain about left arm pain and numbness. During booking, a sergeant examined Karels and felt a grinding in her left arm, which is indicative of a broken bone. He refused to accept custody of Karels because she needed medical attention. The sergeant placed her arm in a splint, and Norlin transported her to a nearby hospital, where an X-ray revealed that Karels had a fracture of the left humerus bone. Karels was then transported to a hospital in St. Cloud, Minnesota, for emergency surgery on what was found to be a spiral, comminuted shaft fracture, with the radial nerve interposed at the fracture site and wrapped around a fracture fragment.

Karels was charged with the following misdemeanors: disorderly conduct, obstruction without force, possession of marijuana, and possession of paraphernalia. She pleaded guilty to disorderly conduct and the remaining charges were dismissed. Norlin's use-of-force review form indicated that force was used to "effect an arrest" and listed "active resistance" as the suspect's actions.

In denying the motion for summary judgment, the district court rejected Storz's argument that his use of force was justified because Karels was resisting arrest. The court concluded that "there is a genuine issue as to whether and to what degree Karels was resisting arrest, and, if Karels did resist, whether Storz's use of force was reasonable." D. Ct. Order of June 8, 2017, at 14.

## II. Discussion

We have jurisdiction over this interlocutory appeal under the collateral order doctrine. Mitchell v. Forsyth, 472 U.S. 511, 530 (1985). Our jurisdiction is limited, however, to "abstract issues of law" and does not extend to the "determination that the evidence is sufficient to permit a particular finding of fact after trial." Johnson v. Jones, 515 U.S. 304, 314, 317 (1995). Accordingly, we accept as true the facts that the district court found were adequately supported, as well as the facts that the district court likely assumed, to the extent they are not "blatantly contradicted by the record." Burnikel v. Fong, 886 F.3d 706, 709 (8th Cir. 2018) (quoting Scott v. Harris, 550 U.S. 372, 380 (2007)). We review *de novo* the issues of law. Id.

Qualified immunity shields a law enforcement officer from liability in a § 1983 action "unless (1) the evidence, viewed in the light most favorable to [the plaintiff], establishes a violation of a constitutional or statutory right, and (2) the right was clearly established at the time of the violation, such that a reasonable official would have known that his actions were unlawful." Blazek v. City of Iowa City, 761 F.3d 920, 922-23 (8th Cir. 2014) (citing Pearson v. Callahan, 555 U.S. 223, 232 (2009)).

### A.

Storz first argues that he did not use excessive force in effectuating Karels's arrest. An excessive force claim arises under the Fourth Amendment, so we apply a reasonableness standard. See Graham v. Connor, 490 U.S. 386, 395 (1989). "The

-6-

Fourth Amendment requires us to ask, based on the perspective of a reasonable officer on the scene, 'whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" Ellison v. Lesher, 796 F.3d 910, 916 (8th Cir. 2015) (quoting Graham, 490 U.S. at 397). Circumstances relevant to the reasonableness of the officers' conduct include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396.

Considering the circumstances surrounding the seizure and arrest of Karels, we are not convinced that Storz's use of force was objectively reasonable as a matter of law. The officers responded to a report of a person who was drunk and argumentative in a home where she was living at the time, which is not necessarily a crime. Karels did not attempt to physically harm the officers or the Owenses, who told the officers that they did not feel threatened by Karels. Norlin's use-of-force review form stated that force was necessary to "effect an arrest," not because the officers needed to protect themselves or others. The officers cited Karels with four nonviolent, non-severe misdemeanor offenses. In pleading guilty to disorderly conduct, Karels admitted only that her loud and obnoxious behavior had caused others to become alarmed, angry, and resentful. See Minn. Stat. § 609.72 subd. 1(3).

Viewing the evidence in the light most favorable to Karels, we reject Storz's argument that his use of force was justified because a reasonable officer in Storz's position would have viewed Karels's behavior as resisting arrest. Karels testified that she was not given time to comply with the command to put her hands behind her back. Moreover, she "informed defendants she needed to put her cigarette out." D. Ct. Order of June 8, 2017, at 5 n.1. Although Karels conceded that it might have felt like she was pulling away from Storz as "Norlin pulled her right arm towards an empty coffee can, and away from Storz, to put out the cigarette," id. at 5, a reasonable

-7-

officer in Storz's position would have realized that Karels was extinguishing her cigarette, with the other officer's help, just as she intended to do. A jury thus could find that a reasonable officer in Storz's position would not have perceived Karels's actions as resistance.

Storz contends that we have sanctioned the use of force when an officer interprets an arrestee's actions as resistance, even if the arrestee did not intend to resist. He cites Carpenter v. Gage, 686 F.3d 644 (8th Cir. 2012), a case in which the arrestee was having a stroke, and Ehlers v. City of Rapid City, 846 F.3d 1002 (8th Cir. 2017), a case in which the arrestee claimed that he did not hear the officer's commands. In Carpenter, the officers knew that a man had chased first responders from his home with a baseball bat and that he had access to a rifle. 686 F.3d at 647. Officers took him down after he ignored both a command to stop moving and a threat that an officer would deploy his taser. Id. In Ehlers, "an officer took a fleeing arrestee to the ground after he ignored repeated warnings to put his hands behind his back." Rokusek v. Jansen, 899 F.3d 544, 547 (8th Cir. 2018) (summarizing Ehlers). The officers in Carpenter and Ehlers faced noncompliant arrestees and circumstances that were fraught with danger and unpredictability. In contrast, a jury could find that a reasonable officer in Storz's position would not have interpreted Karels's actions as noncompliance and would have known that Karels posed neither an immediate threat to anyone's safety nor a flight risk. In light of the circumstances surrounding the take-down, the district court properly concluded that genuine disputes of material fact precluded summary judgment.[2]

---

[2]In so holding, we have considered Karels's injury as evidence of the amount and type of force used by Storz in effectuating Karels's arrest. See Chambers v. Pennycook, 641 F.3d 898, 906 (8th Cir. 2011) (explaining that "[t]he degree of injury is certainly relevant insofar as it tends to show the amount and type of force used").

B.

Storz next argues that his use of force did not violate any clearly established Fourth Amendment right. "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" Mullenix v. Luna, 136 S. Ct. 305, 308 (2015) (quoting Reichle v. Howards, 566 U.S. 658, 664 (2012) (internal quotation marks and alteration omitted)). We may not "define clearly established law at a high level of generality," but rather must determine "whether the violative nature of *particular* conduct is clearly established." Id. (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 742 (2011)).

Storz contends that it was not clearly established on March 28, 2015, that taking down Karels would constitute excessive force because her "behavior [could] be interpreted as resistance." Appellant's Br. 22. He relies primarily on Blazek v. City of Iowa City, 761 F.3d 920 (8th Cir. 2014). In Blazek, officers drew their guns and entered the apartment of a federal parolee. They encountered the parolee's roommate, who was "'belligerent,' refused to identify himself except as 'the roommate,' and would not stay seated as directed." Id. at 922. To handcuff the man, an officer "grabbed his arm, twisted the arm up behind him, and threw him to the ground." Id. We held that it was not clearly established that the officer's use of force was unconstitutional, id. at 923, comparing the take-down in Blazek to the one used by the officer in Wertish v. Krueger, 433 F.3d 1062 (8th Cir. 2006). In Wertish, officers initiated a traffic stop of a vehicle that reportedly had forced another motorist off the road. Instead of stopping, the vehicle continued to drive erratically and dangerously. When the vehicle finally came to a stop, the officers approached the driver with guns drawn and ordered him to exit the vehicle. He did not comply, so an officer "'forcefully threw' the plaintiff to the ground, pinned him down, and placed his weight into the plaintiff's back before handcuffing him." Blazek, 761 F.3d at 923 (quoting Wertish, 433 F.3d at 1068 (Bye, J., concurring)). We concluded that the officers' use of force was objectively reasonable, explaining that "[w]hen a suspect

is passively resistant, somewhat more force may reasonably be required." Wertish, 433 F.3d at 1066-67 (majority opinion).

Blazek and Wertish do not establish that the slightest resistance justifies any subsequent use of force by an officer, as Storz seems to argue. They instead establish that an officer may use "somewhat more force" on a "passively resistant" suspect. The evidence here would support a finding that Karels was not "passively resistant." A jury could find that she did not have time to comply with Storz's command to put her hands behind her back before he used significant force against her. A jury could also consider Norlin's use-of-force review form, on which he did not check the box marked "passive resistance" in describing Karels's actions. Whether a reasonable officer would have interpreted Karels as being resistant—either passively or actively—is a disputed question of fact that a jury must decide. As set forth above, a jury could find that Karels did not resist at all and that a reasonable officer would have known that she was not resisting.[3]

Viewing the facts in the appropriate light, several cases establish that every reasonable officer would have understood that he could not forcefully take down Karels—a nonviolent, nonthreatening misdemeanant who was not actively resisting arrest or attempting to flee—in the allegedly violent and uncontrolled manner that Storz did. See Small v. McCrystal, 708 F.3d 997, 1005 (8th Cir. 2013); Montoya v. City of Flandreau, 669 F.3d 867, 873 (8th Cir. 2012); Shannon v. Koehler, 616 F.3d

---

[3]In light of these disputed facts, this court's recent decision in Kelsay v. Ernst does not control the outcome here. In Kelsay, we held that "[i]t was not clearly established in May 2014 that a deputy was forbidden to use a takedown maneuver to arrest a suspect who ignored the deputy's instruction to 'get back here' and continued to walk away from the officer." No. 17-2181, 2018 WL 4622711, at *3 (8th Cir. Sept. 27, 2018). Unlike the plaintiff in Kelsay, it is disputed whether Karels ignored Storz's commands or physically resisted arrest and whether a reasonable officer would have interpreted her actions as noncompliance or resistance.

855, 864-65 (8th Cir. 2010); see also Michael v. Trevena, 899 F.3d 528, 533 (8th Cir. 2018); Rokusek, 899 F.3d at 548; Atkinson v. City of Mountain View, 709 F.3d 1201, 1213 (8th Cir. 2013); Brown v. City of Golden Valley, 574 F.3d 491, 499 (8th Cir. 2009); Rohrbough v. Hall, 586 F.3d 582, 586-87 (8th Cir. 2009).  To the extent Storz argues that these cases present different facts and circumstances, "there is no requirement that [the plaintiff] must find a case where 'the very action in question has previously been held unlawful,' see Rohrbough, 586 F.3d at 587, so long as 'existing precedent [has] placed the statutory or constitutional question beyond debate,' al-Kidd, 563 U.S. at 741."  Rokusek, 899 F.3d at 548 (second alteration in original).

We affirm the district court's order denying Storz's summary judgment motion.

———————————————