# United States Court of Appeals
## For the Eighth Circuit

_____

No. 24-3491

_____

Bradley R. Bolin

*Plaintiff - Appellee*

v.

Deputy Landon Wilkins, In his official and individual capacities; Deputy Reeve Koehler, In his official and individual capacities

*Defendants - Appellants*

Corporal Benjamin Vinson, Jr., In his official and individual capacities

*Defendant*

Sergeant Levi Franks, In his official and individual capacities; Deputy Joshua Loya

*Defendants - Appellants*

MPO Samuel Mosley; Sheriff Shawn Holloway; Benton County, Arkansas; Deputy David Fischer; Deputy Adam Baker; Deputy Shannon Monday; Deputy Davis Golden; Deputy Jordin Beard; Deputy Logan Cornelison; Deputy Michael White; Deputy Brittany Wright; Deputy Jack Simpson; Deputy Cedric Lampkin; Deputy Bryan Cooper

*Defendant*s

_____

Appeal from United States District Court
for the Western District of Arkansas - Fayetteville

_____

Submitted: November 19, 2025
Filed: May 7, 2026

_____

Before COLLOTON, Chief Judge, SHEPHERD and ERICKSON, Circuit Judges.

_____

ERICKSON, Circuit Judge.

Bradley Bolin brought a 42 U.S.C. § 1983 action against law enforcement officers for violations of the Due Process Clause of the Fourteenth Amendment and related state law claims. Sergeant Levi Franks and Deputies Joshua Loya, Landon Wilkins, and Reeve Koehler appeal from the district court's denial of their motion for summary judgment based on qualified immunity. We affirm in part and reverse in part.

## I.    BACKGROUND

On April 1, 2020, shortly after midnight, the Rogers Police Department arrested Bolin on misdemeanor charges of resisting arrest, disorderly conduct, and public intoxication, and on a Class D felony charge of battery in the second degree. Rogers Police Officer Samuel Mosley transported Bolin to the Benton County Detention Center ("BCDC") for booking and to remain in Benton County custody pending release on bail.

There are audio and video recordings of Bolin's interactions with law enforcement in the Booking Lobby. For the remainder of the relevant incidents at BCDC, there are only video recordings, and one of the incidents has only a partial recording of the incident.

At 1:00 am, Deputies Golden and White escorted Bolin into the BCDC Booking Lobby. The deputies removed Bolin's handcuffs and then Bolin placed his hands on the wall in front of him. At 1:02 am, a deputy handed Bolin a mask, which

he put on and then returned his hands to the wall again. Bolin stood with his hands on the wall for another three minutes. For several minutes after this, the deputies directed Bolin's actions in various ways and after Bolin complied each time, he again returned his hands to the wall.

At 1:08:46, deputies allowed Bolin to remove his hands from the wall so he could sign the property sheet. Instead of signing the sheet, Bolin removed his mask to talk to an officer. Deputy White put the mask back in place, and another officer said, "Brad, Brad, listen to them." It does not appear Bolin signed the property sheet, and, at 1:10:03, Bolin turned to face the wall again and put his hands behind his back.

At 1:10:13, when there were now seven law enforcement officers in the Booking Lobby, Bolin swayed and leaned toward the wall. Five seconds later, deputies crowded around Bolin and took him to the ground. Four deputies completely covered Bolin's body on the ground.

While Bolin was still prone on the ground with five other deputies either on top of him or holding him down, Deputy Loya put his taser on Bolin's back under his left shoulder and delivered a five-second drive stun. A few seconds later, Deputy Loya put his taser on Bolin's lower back and delivered another five-second drive stun.

Eventually deputies handcuffed Bolin, pulled him to his feet, and walked him into Booking Cell 3. After the deputies removed Bolin's handcuffs, and all the deputies except Deputy Loya had left the cell, Bolin stood up. Six deputies stood outside the cell, and Deputy Loya stood just inside the cell doorframe with his pepper spray gun aimed at Bolin's face. Deputy Loya and Bolin were at least six feet apart.

While Bolin stood with his arms raised, Deputy Loya fired four pepper spray balls at Bolin in the span of two seconds. Bolin turned towards the back wall of the

cell during the shooting. Two pepper spray balls hit the back wall of the cell, and the other two hit the back of Bolin's head and neck.

About an hour later, deputies took Bolin to shower. When they returned with Bolin now wearing an inmate uniform, five deputies escorted Bolin into Booking Cell 4. Inside the cell, the deputies took Bolin to the back wall and crowded around behind him. Deputy Loya delivered two knee strikes to Bolin's left thigh. Approximately two minutes after entering the cell, the deputies started to leave, and Bolin lay on his stomach with his head facing the back wall.

At approximately 9:27 am, Bolin walked by himself down the E-Pod Hallway holding his belongings in preparation to leave because his parents had posted bail. Deputy Wilkins approached him and allegedly ordered Bolin to place his belongings on the ground and his hands on the wall. Instead, Bolin touched the light switch on the wall and turned the lights off and then on. Ten seconds later, Bolin put his belongings on the ground and then put his right hand on the wall but not his left.

Deputy Wilkins grabbed Bolin's left wrist and put the left hand on the wall. While Bolin's hands were on the wall, Deputy Wilkins grabbed Bolin's forearm, quickly pulled it backward, spun Bolin around and slammed him to the floor. Bolin's head struck the opposite wall as Deputy Wilkins threw him down.

While on the floor, the two men struggled for a few seconds during which Deputy Wilkins delivered twelve closed fist strikes to Bolin's head and torso. Deputy Wilkins restrained Bolin's right hand, which prevented Bolin from using it to shield his face from the strikes. A few seconds later, three more officers arrived, and Deputy Koehler immediately delivered a strike to Bolin's shoulder. Within ten seconds, four more deputies and Sergeant Franks join the altercation. With seven deputies either on top of or pressing down on Bolin, Sergeant Franks delivered two taser stuns to Bolin.

-4-

Deputies handcuffed Bolin, pulled him to his feet, and then escorted him to the nurses' station to receive treatment for his injuries. Bolin's face and part of the front of his inmate uniform were covered in blood.

While receiving medical treatment, Bolin told the nursing staff, "I wish you guys would go ahead and kill me to get it over with." Nursing staff interpreted this as an intention to self-harm, so a nurse ordered that he be placed in a tamper resistant smock. Officers escorted him to Pod E-103 to change into the smock.

At this point, there is a two-minute gap in the video recording. When the video resumes, there are multiple officers hitting, punching, and kicking Bolin, who is on the ground but not visible on the recording because the officers are surrounding him. The recording of this part of the attack lasts for approximately twenty seconds before there is another missing gap in the recording. When the recording resumes about ninety seconds later, the officers are no longer striking Bolin.

Two of the officers who used force during the incident in Pod E-103 were Deputy Koehler and Sergeant Franks. Deputy Koehler admitted that he delivered two knee strikes to the left side of Bolin's body. Sergeant Franks admitted that he delivered two taser stuns to Bolin.

Following this last incident, officers escorted a naked and handcuffed Bolin out of the cell. A jail nurse ordered him to the hospital for treatment. Bolin claims his injuries include permanent pain and diminished sight in his right eye, short-term memory loss, and psychological problems.

## II.    DISCUSSION

As a threshold matter, we must determine whether we have jurisdiction over the officers' claims in this interlocutory appeal. The appealable issue from a denial of qualified immunity is "purely a legal one" regarding whether the alleged facts "support a claim of violation of clearly established law." Johnson v. Jones, 515 U.S.

304, 313 (1995) (quoting Mitchell v. Forsyth, 472 U.S. 511, 528 n.9 (1985)).  We lack jurisdiction to review the district court's determination that the summary judgment record raised genuine issues of material fact.  Id.

Regarding facts adopted by the district court, we may reverse only if those facts are "blatantly contradicted by the record . . . ."  Scott v. Harris, 550 U.S. 372, 380 (2007).  For a recording to "blatantly contradict" the non-movant's testimony, it must utterly discredit the account provided by the non-movant.  See id. at 379, 380 (the video recording showed the non-movant driving in a manner that violated traffic laws, which was the opposite of the conduct described by the non-movant's testimony and adopted by the district court).  At times, the officers assert the district court could consider the video recordings only if they blatantly contradicted other evidence.  This is not the proper application of the "blatantly contradict" principle.  A district court may consider video evidence like any other evidence in determining the facts in the light most favorable to Bolin.  See Jain v. CVS Pharmacy, Inc., 779 F.3d 753, 759 (8th Cir. 2015) (court may consider "all admissible evidence" on a motion for summary judgment).

Most of the officers' arguments ask this Court to ignore disputed facts in the record or to resolve those disputes in their favor.  We lack jurisdiction to independently weigh the evidence.  Johnson, 515 U.S. at 313; see Walton v. Dawson, 752 F.3d 1109, 1116 (8th Cir. 2014) (quoting Thomas v. Talley, 251 F.3d 743, 747 (8th Cir. 2001)) (no jurisdiction to evaluate "the district court's determination of evidentiary sufficiency").  We turn now to the issues over which we have jurisdiction.

Qualified immunity shields government officials from suit unless the detainee shows (1) "the deprivation of a constitutional or statutory right" and (2) the officials' conduct violated a clearly established right.  Walton, 752 F.3d at 1116 (quoting Howard v. Kan. City Police Dep't, 570 F.3d 984, 988 (8th Cir. 2009)).  We may consider these two questions in any order.  Id.

For an excessive force claim under the Due Process Clause, the "detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." Kingsley v. Hendrickson, 576 U.S. 389, 396-97 (2015).  A detainee may establish objective unreasonableness by showing the actions were not "rationally related to a legitimate nonpunitive governmental purpose" or the actions appeared "excessive in relation to that purpose." Id. at 398 (quoting Bell v. Wolfish, 441 U.S. 520, 561 (1979)).  A district court order denying summary judgment on qualified immunity grounds is reviewed *de novo* while viewing the evidence in the light most favorable to Bolin.  Glover v. Paul, 78 F.4th 1019, 1021 (8th Cir. 2023).

A.    Booking Lobby Incident

The district court concluded there was a genuine dispute of material fact regarding whether Bolin was resisting—even passively resisting—officer commands at any point during the encounter in the Booking Lobby.  Deputy Loya contends this conclusion, as it relates to Bolin's actions while on the ground, is blatantly contradicted by the audio recording.

After the deputies took Bolin to the ground in the Booking Lobby, the audio recording includes the following exchange:

0:04:17: Deputy: Brad, stop.
0:04:18: Deputy Loya: I'm going to tase him.
0:04:19: Deputy: Stop, Brad.
0:04:20: Deputy: Hold on, hold on.
0:04:22: Deputy: Knock it off.  Give me your arm.
0:04:26: Deputy: Brad, listen to me, relax.
0:04:28: Bolin: No.
0:04:31: Deputy Loya: You don't relax, you're going to get tased.  you understand that?
0:04:33: Bolin: Do it as many times as you f---ing want.

When evaluating whether the force used was excessive, if the officer's action served a legitimate nonpunitive governmental purpose, then the inquiry focuses on whether the force used was excessive in relation to that purpose. Kingsley, 576 U.S. at 398. In a jail, a legitimate nonpunitive governmental purpose includes preserving internal order by dealing with an actively resisting detainee. Id. at 397. Kicking, deploying flash-bang grenades, and shooting bean-bag guns against detainees who were "lying submissively, face-down, in the pod" is a clearly established unconstitutional use of force. Edwards v. Byrd, 750 F.3d 728, 732 (8th Cir. 2014); see also Smith v. Conway Cnty., 759 F.3d 853, 860-61 (8th Cir. 2014) (use of taser on passive detainee attempting to comply with officer's order was a clearly established unconstitutional use of force).

In the audio recording, a deputy asked Bolin to present his arm for cuffing. The deputies also issued repeated warnings to Bolin that if he failed to comply with their reasonable orders, he would be tased. Bolin responded by resisting and inviting Deputy Loya to tase him as many times as he wanted. The audio recording blatantly contradicts the district court's conclusion that there was a genuine dispute of material fact regarding whether Bolin resisted deputies when he was on the ground.

Because Bolin refused to comply with the deputies' orders, the use of the taser did not deprive him of a constitutional right. Cf. Smith, 759 F.3d at 860-61 (taser use on a passive detainee attempting to comply with an officer's order). The district court's denial of qualified immunity to Deputy Loya for the use of a taser in the Booking Lobby is reversed.

B.     Booking Cell 3 Incident

Deputy Loya asserts that, even using the facts applied by the district court, it was not clearly established that his firing of the pepper spray gun four times on Bolin in Booking Cell 3 was unconstitutional. At the time he fired, the district court assumed that Deputy Loya stood in the doorframe of the cell at least six feet away

from Bolin, who stood with his arms raised, and there were six deputies close behind Deputy Loya.

The use of a pepper spray gun for non-compliance with an order is excessive force when an inmate does not pose a real threat to others or raise security concerns. Treats v. Morgan, 308 F.3d 868, 872 (8th Cir. 2002). At the time of this incident, it was clearly established that the use of a pepper spray gun absent a physical threat to others violated the Eighth Amendment, id. at 875, so it was also clearly established as a violation of the Due Process Clause, Walton, 752 F.3d at 1117 (citation omitted) (rights of a pretrial detainee are "at least as great" as the protections afforded to an inmate by the Eighth Amendment).

Deputy Loya asserts that Treats is insufficiently specific to provide notice that his use of the pepper spray gun violated clearly established law. A right cannot be defined at a "high level of generality;" it must be sufficiently definite "that every reasonable official would understand that what [he] is doing is unlawful." Martinez v. Sasse, 37 F.4th 506, 509 (8th Cir. 2022) (citations omitted); see Treats, 308 F.3d at 872 (quoting Saucier v. Katz, 533 U.S. 194, 202 (2001)) (right is clearly established when it is "clear to a reasonable officer that his conduct was unlawful in the situation he confronted.").

In Treats, a difficult inmate failed to follow the officer's commands, but he did not pose a real threat to others or pose a security risk. 308 F.3d at 872. The facts in Treats are sufficiently definite to provide notice to a reasonable officer that when Bolin was standing inside his cell, six feet away, with his arms raised, the officer would violate clearly established law by firing pepper spray balls at him.

C.    E-Pod Hallway Incident

Deputy Wilkins asserts that the district court's reliance on Karels v. Storz, 906 F.3d 740 (8th Cir. 2018) and MacKintrush v. Pulaski County Sheriff's Department, 987 F.3d 767 (8th Cir. 2021) to hold he violated a clearly established right by

slamming Bolin to the ground in the E-Pod hallway was an error because those cases involved petty misdemeanants while one of Bolin's charges was a felony. A pretrial detainee, regardless of his charges, has the right to be free from the use of excessive force. Kingsley, 576 U.S. at 397 (quoting Graham v. Connor, 490 U.S. 386, 395 (1989)). While MacKintrush and Karels referenced the arrestee's charges, it was not essential to the legal conclusion. See 987 F.3d at 770-71 (clearly established analysis focused on whether there was a threat to police or active resistance); 906 F.3d at 746-47 (clearly established analysis focused on the individual's alleged resistance).

Since at least 2012, it was clearly established that officers cannot violently take down an individual who was not threatening anyone or actively resisting the officer. McReynolds v. Schmidli, 4 F.4th 648, 655 (8th Cir. 2021). Deputy Wilkins should have known in 2020 that his takedown of Bolin, which included slamming Bolin's head against the opposite wall, violated clearly established law.

D.    Pod E-103 Incident

Sergeant Franks contends that, even accepting all the facts adopted by the district court, it was not clearly established that his use of the taser in Pod E-103 violated Bolin's rights. Sergeant Franks claims his conduct was justified under Franklin v. Franklin County, 956 F.3d 1060 (8th Cir. 2020).

In Franklin, the deputy attempted to move Franklin, a detainee, to an isolation cell because he had been "fighting with inmates and appeared to be under the influence of drugs." 956 F.3d at 1061. Franklin refused to move, adopted a "combative stance," and challenged the deputy to fight. Id. Franklin then threw items at the deputy and tried to pull the deputy into the cell. Id. Another deputy arrived, wrestled Franklin to the ground, and, after a struggle, Franklin kicked the deputy off. Id. Only after this series of violent events with a detainee, who had also attacked other inmates, did a deputy use a taser. Id.

Under the facts adopted by the district court here, Bolin's actions bear no resemblance to the extreme situation presented by the detainee in <u>Franklin</u>. At the time Sergeant Franks tased Bolin, it was clearly established that a non-violent detainee has a right to be free from being tased for non-compliance. <u>Smith</u>, 759 F.3d at 861.

Relying on <u>Northern States Power Company v. Federal Transit Administration</u>, 358 F.3d 1050 (8th Cir. 2004), Deputy Koehler and Sergeant Franks claim that Bolin did not assert a § 1983 excessive force claim regarding the conduct in Pod E-103. In <u>Northern States Power</u>, Xcel's suit contested the Minnesota Department of Transportation's ("MnDOT") authority to order the relocation of underground utility facilities, but Xcel failed to allege a claim that MnDOT's regulations were unreasonable under Minnesota statutes and regulations. 358 F.3d at 1051, 1056. Here, Bolin's complaint alleges claims under § 1983 based on being assaulted by Benton County officers while in their custody on April 1, 2020. Unlike the plaintiff in <u>Northern States Power</u>, Bolin provided the statutory and constitutional bases for his claims.

## III. CONCLUSION

For the foregoing reasons, we reverse the denial of qualified immunity to Deputy Loya for his use of a taser in the Booking Lobby but otherwise affirm the district court's order.

_____